**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 03 2014

JAMES W. McCORMACK, CLERK
By: _____
                              DEP CLERK

JAMES HAJNY and J&J VIRTUAL
COMMUNICATIONS, LLC, on behalf of
themselves and all others similarly situated,

      **Plaintiffs,**

This case assigned to District Judge _____
and to Magistrate Judge _____

v.

Case No. 4:14cv006 SWW

**ARVEST BANK,**

      **Defendant.**

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs James Hajny and J&J Virtual Communications, LLC, by and through their undersigned counsel, on behalf of themselves and all persons similarly situated, submit this Class Action Complaint and Demand for Jury Trial and allege the following based on personal knowledge as to allegations regarding the Plaintiffs and on information and belief as to other allegations.

## INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution, and declaratory relief from Defendant Arvest Bank ("Arvest") arising from its assessment and collection of improper and excessive overdraft fees.

2.      In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including Arvest. For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers. Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for

customers and charge them in each instance.  An FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  An FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent.*

3.     In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more customers struggled to maintain positive checking account balances.  *In 2009, banks brought in $37.1 billion in overdraft charges alone.*  Since 2010, regulatory changes have taken effect as described below.  Although the changes initially lowered the amount of overdraft fees, banks have subsequently found ways to generate amounts equivalent to prior to 2010.  With $14 billion in assets, Arvest, through 281 banking offices, including 125 throughout Arkansas, provides commercial and retail banking services to customers.  Thus, Arvest is a notable beneficiary of these staggering overdraft charges.

4.     Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a fee on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

5.     Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a check to purchase groceries, the

grocery store would only know whether the check cleared *after* the groceries had been purchased.

6.     The same considerations are not present when customers use debit cards. Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions. Retail and service transactions could still be executed if customers presented an alternative form of payment. Automated teller machine ("ATM") transactions could still proceed if banks provided a warning that an overdraft fee would be assessed, and customers chose to proceed nevertheless. In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

7.     For years, instead of simply declining debit transactions when there were insufficient funds, or warning its customers that an overdraft fee would be assessed if they proceeded with the transaction, Arvest routinely processed such transactions and then charged its customers an overdraft fee (currently in the amount of $17) – even when the transaction was for only a few dollars. Arvest took this action even though its agreements with customers only allowed Defendant to charge overdraft fees on transactions made by check. Arvest's automatic, fee-based overdraft scheme was intentionally designed to maximize overdraft fee revenue for the Bank.

8.     Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of improper overdraft fees, Arvest failed to adequately notify its customers of its true overdraft practices and/or their legal rights to avoid same. Indeed, the company's written documentation, including its contracts, comported with customers' common sense expectation that the bank would not approve a debit card transaction when there was no money in the account.

3

9.     In many instances, these overdraft fees cost account holders of Arvest hundreds of dollars in a matter of days, or even hours, when they were overdrawn by only a few dollars. Even today, Arvest sometimes charges customers *eight* overdraft fees (amounting to well over $100) in a single day.   Even more egregious, customer accounts may not have actually been overdrawn at the time the overdraft fees were charged, or at the time of the debit transaction.

10.     Thus, it is through manipulation and alteration of customers' transaction records that Arvest has maximized overdraft penalties imposed on customers.

11.     In response to the rampant abuse of overdraft charges by banks, the Board of Governors of the Federal Reserve System (the "Board") implemented Regulation E (12 C.F.R. § 205.17) to amend the Electronic Funds Transfer Act to include notice requirements for banks concerning overdraft charges.

12.     Under Regulation E, a financial institution may not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the financial institution's overdraft program unless the financial institution provides the customer with written notice, separate from all other information, that describes the institution's overdraft program, and obtains the customer's affirmative consent to the institution's payment of ATM or one-time debit card transactions that would incur an overdraft fee, and provides written confirmation of the consumer's consent along with a statement of informing the consumer of the right to revoke this consent.  12 C.F.R. § 205.17(b)(1).

13.     For consumers with an account at a financial institution prior to July 1, 2010, the institution cannot assess any fees on a consumer's account on or after August 15, 2010 for paying an ATM or one-time debit card transaction pursuant to the overdraft service unless the institution has complied with 12 C.F.R. § 205.17(b)(1).  12 C.F.R. § 205.17(c)(1).

14.     For accounts opened on or after July 1, 2010, the financial institution cannot assess any fees on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the overdraft service unless the institution has complied with 12 C.F.R. § 205.17(b)(1).  12 C.F.R. § 205.17(c)(2).

15.     The debit card transactions and point of sale transactions described herein qualify as an "electronic funds transfer" under the Electronic Funds Transfer Act.

16.     Arvest qualifies as a financial institution that provides an overdraft service as contemplated by the Electronic Funds Transfer Act.  As described below, Arvest has failed to comply with these regulations which were intended to protect customers from improper overdraft fees on debit card transactions.

## JURISDICTION AND VENUE

17.     This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it involves a federal question.   This Court also has original jurisdiction pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, there are at least 100 members of the putative Class, and at least one of the members of the proposed Class is a resident of a different state than Arvest, which is an Arkansas entity.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Arvest is subject to personal jurisdiction here, regularly conducts substantial business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in this district.

## THE PARTIES

19.     Plaintiff James Hajny is a former customer of Arvest who is a citizen of Missouri.

5

20.     Plaintiff J&J Virtual Communications, LLC ("J&J") is a Missouri limited liability company.

21.     Arvest is an Arkansas-chartered bank originally formed in 1871. Arvest operates out of 281 bank branches in the states of Arkansas, Kansas, Missouri, and Oklahoma. Although Arvest is not formally connected to Wal-Mart, the two companies share deep ties. Members of the Walton family own over 95% of Arvest Bank. Wal-Mart has attempted to enter the banking business for years and has faced strong opposition from the Republican and Democratic parties, the Federal Reserve, large and small banks, labor unions, and community groups.

## CLASS ALLEGATIONS

22.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

23.     Plaintiffs propose two classes, defined as:

All Arvest customers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of Arvest's practices of assessing an overdraft fee on a debit card transaction at a time when the customer agreement did not provide for such a fee, assessing an overdraft fee even when a debit card transaction should not have been authorized, re-sequencing debit card transactions from highest to lowest dollar amount, or assessing overdraft fees even when a customer had sufficient funds in their account to cover all merchant requests for payment (hereinafter referred to as "Improper Overdraft Class").

All Arvest customers in the United States who were assessed an overdraft fee for an ATM or debit card transaction after July 1, 2010, if the account was opened on or after July 1, 2010, or August 15, 2010, if the account was opened prior to July 1, 2010, even though Arvest failed to previously comply with the Electronic Funds Transfer Act (hereinafter referred to as "the EFTA Class").

24.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate and as the Court may otherwise allow.

25.     Excluded from the Classes are Arvest, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Arvest has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

26.     The members of the Classes are so numerous that joinder is impractical.  The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Arvest's records.

27.     The claims of the representative Plaintiffs are typical of the claims of the Classes. With respect to the Improper Overdraft Class, Plaintiffs, like all other members, were charged overdraft fees by Arvest as a result of its improper practices.  With respect to the EFTA Class, Mr. Hajny and all other members were charged overdraft fees on ATM or debit card transactions in violation of EFTA and the regulations based thereupon.  J&J is not a member of the EFTA Class, since it was a business customer of the Bank.  The representative Plaintiffs, like all members of the Classes have been damaged by Arvest's misconduct in that they have been assessed improper overdraft charges.  Furthermore, the factual basis of Arvest's misconduct is common to members of both Classes, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

28.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

29.     Among the questions of law and fact common to the Improper Overdraft Class are whether Arvest:

a.     Assessed overdraft fees for debit card transactions at times when the customer agreement did not provide for such fees;

b.     Did not obtain affirmative consent from its customers prior to processing transactions that it knew would result in overdraft fees;

c.     Did not alert its customers that a debit card transaction would trigger an overdraft fee, and did not provide its customers with an opportunity to cancel such transactions;

d.     Manipulated and reordered transactions so that it could increase the number of overdraft fees it imposes;

e.     Manipulated and reordered debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.     Imposed overdrafts and overdraft fees even when there were sufficient funds in the account;

g.     Breached the Bank's form contracts Class through its overdraft policies and practices;

h.     Breached the covenant of good faith and fair dealing through its overdraft policies and practices;

i.     Required its customers to enter into standardized account agreements which include unconscionable provisions;

j.     Converted money belonging to Plaintiffs and other members of the Improper Overdraft Class through its overdraft policies and practices; and

k.     Was unjustly enriched through its overdraft policies and practices.

30.     Among the questions of law and fact common to the EFTA Class are whether Arvest:

a.     Provided its customers with a notice describing its overdraft services that complied with 12 C.F.R. §§ 205.17(b)(1)(i), (d);

b.     Provided its customers with a reasonable opportunity to affirmatively consent, or opt in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(ii);

c.     Obtained its customers' affirmative consent, or opt-in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(iii);

d.     Provided its customers with confirmation of their consent in accordance with 12 C.F.R. § 205.17(b)(1)(iv); and

e.     Assessed overdraft fees in violation of EFTA.

31.     Other questions of law and fact common to the Classes include:

a.     The proper method or methods by which to measure damages, and

b.     The declaratory and injunctive relief to which the Classes are entitled.

32.     Plaintiffs' claims are typical of the claims of other members of the Improper Overdraft Class, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Arvest's account agreements and other related documents. Mr. Hajny's claims are typical of the claims of other members of the EFTA Class, in that they are based on EFTA and arise from the same wrongful overdraft policies and practices. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other member of the Classes.

33.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular,

class actions on behalf of customers and against financial institutions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

34. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Arvest, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Arvest's misconduct will proceed without remedy.

35. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A. Arvest

36. Arvest has $14 billion in assets and provides banking services to customers through 281 banking offices in the states of Arkansas, Kansas, Missouri, and Oklahoma.

37. Arvest is in the business of providing its customers with a variety of banking products and services. Customers who open a checking account are provided with a debit card, also known as a check card or ATM card. Through such debit cards, customers can engage in transactions using funds which are withdrawn from their accounts by engaging in "debit" or

"point of sale" ("POS") transactions, or may withdraw money from their accounts at ATMs. Whether the card is used to execute POS transactions or to withdraw cash from ATMs, the transaction is processed electronically. As a result, Arvest is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time. Despite the terms of its own form contracts, Arvest has intentionally authorized debit card transactions even when the transaction is not covered by the customer's balance of funds. It has done so in order to assess highly profitable overdraft fees, even at times when the Bank's contracts did not allow the assessment of such fees on ATM or POS transactions.

38.   Arvest employs sophisticated software to automate its overdraft system. This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer. Arvest utilizes this sophisticated software system to generate overdraft fees. Customers at all Arvest branches suffer from the same policies and systems in regard to overdraft fees.

39.   As a result of Arvest's manipulation and alteration of customers' transaction records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions. Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur. For example, if a customer, whose account had a $100 balance at the time Arvest posted several transactions, made four transactions of $20 and then one subsequent transaction of $100, Defendant reordered the debits from largest to smallest, imposing four overdraft fees on the customer. Conversely, if the $100 transaction were debited last – consistent with the actual order of transactions – only one overdraft fee would have been

assessed.  *See* FDIC Study of Bank Overdraft Programs, November 2008, available at: http://www.fdic.gov/bank/analytical/overdraft/, at p. 11, n.12.

### B.   Arvest's Relevant Customer Documents Regarding Overdrafts.

40.   Plaintiffs and all members of the Classes maintain or maintained a checking account with Arvest.  The terms of the Bank's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by Arvest, which is the party of vastly superior bargaining strength.  The account agreement thus constitutes an agreement of adhesion.  The Bank prepares different versions of the account agreement periodically.  The version of the account agreement that was in place during much of Plaintiffs' time as customers is attached hereto as Exhibit A.

41.   The account agreement states the following as to overdraft fees:

A check that will overdraw the available account balance will trigger a service charge, whether we pay the item or dishonor it.  We may, at our option and in lieu of other charges in connection with an overdraft, charge interest on the overdraft at a rate not to exceed the maximum legal rate until paid.  You agree, immediately upon notice from us, to deposit funds sufficient to cover any overdraft plus service charges.  In connection with overdrafts, our determination of the account balance may be made at any time between presentment and our midnight deadline, and will only be made once.  The fact that we may honor withdrawal requests which overdraw the available account balance does not obligate us to do so.  We will not be obligated to honor such requests unless required by law or by another agreement we have with you.

42.   Notably, the account agreement does not authorize the Bank to assess overdraft fees against debit card transactions, but only "[a] check that will overdraw the available account balance."  This distinction is certainly appropriate because, unlike with checks, at the time a debit card transaction (such as an ATM withdrawal or a POS purchase) is approved by the Bank, it knows full well what funds are in the customer's account.  Indeed, the Arvest agreement comports with customers' expectation that the Bank will not authorize debit card transactions when there is no money in the account.

43.     The account agreement does allow for the Bank to make changes:

This account is subject to charges, interest rates, and minimum balance requirements established from time to time by us.  We may change such applicable charges, interest rates, and minimum balance requirements, or any other account terms, at any time, after such notice, if any, as is required by law, or if there is no specific requirement of law, then after reasonable notice.  Notice from us to any one of you is notice to all of you.

Notably, Arvest never informed Mr. Hajny or J&J of its intention to change the agreement to allow the Bank to assess overdraft fees on debit card transactions.

44.     The Bank also prepared a separate debit card agreement which dealt specifically with the use of ATM or debit cards.  The version of the debit card agreement that was in place during much of Plaintiffs' time as a customer is attached hereto as Exhibit B.  Nothing in the debit card agreement authorized the Bank to assess overdraft fees on Plaintiffs' debit card transactions.  Indeed, in at least two places the agreement suggests that transactions will not be authorized if there are not adequate funds in the account.  For example, at the bottom of the first page, it states "You may withdraw up to $600.00 per business day (*but not more than the funds available in the account for withdrawal*) from an electronic terminal that accepts your Arvest ATM Card."  (emphasis added).  The Bank did not honor these terms but rather authorized debit card transactions even though funds were not available, and then assessed an overdraft fee on each such debit card transaction.  Arvest was entitled to amend the debit card agreement but was required to deliver "written notice of such amendment, modification, or rescission to you at least 21 days prior to the effective date of any such change if the change would result in increased fees or charges . . . ."  Arvest never informed Mr. Hajny or J&J of its intention to change the agreement to allow the Bank to authorize approval of debit card transactions "on credit" – where no funds were in the account – or to assess overdraft fees on debit card transactions.

45.     The account agreement and debit card agreement also do not disclose Arvest's improper reordering and overdraft assessment practices described herein.

46.     Until required to do so by federal regulators in 2010, Arvest failed to disclose to customers that they had the option to "opt out" from Arvest's overdraft scheme for debit card transactions.   In 2010, the Bank did provide notice for the first time.   The notice was not accurate, however, and failed to disclose the Bank's true practices.   Moreover, the federally-mandated opt out notices did not purport to change the Bank's account agreement or debit card agreement and so could not authorize new practices or fees.

### C.     Arvest's Reordering of Checking Account Transactions.

47.     In an effort to maximize overdraft revenue, Arvest manipulated and reordered debits from highest to lowest during given periods of time.   Arvest reordered debit card transactions for no reason other than to increase the number of overdraft fees it could charge. This practice violates the parties' contracts and the covenant of good faith and fair dealing.

48.     Transactions involving debit cards used by Arvest customers, including the withdrawal of cash from ATMs and POS transactions with vendors, are processed electronically. As a result, Arvest is notified instantaneously when the customer's debit card is swiped, and has the technological option to accept or decline these transactions.   As described above, pursuant to the Bank's form contracts, Arvest was not allowed to approve debit card transactions to any extent they would result in an overdraft fee.   Nevertheless, the Bank established a policy of authorizing debit card transactions that it knew would result in an overdraft fee.

49.     Notwithstanding the instantaneous nature of these electronic debit card transactions, for years Arvest failed to post charges in the order in which they were assessed or received.   Arvest developed a policy and employed a practice whereby account charges and debits were posted to its customers' accounts out of chronological order for the sole purpose of

14

maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

50.    Instead of processing such transactions in chronological order, Arvest processed them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

51.    Arvest refrained from immediately posting transactions to a customer's account as it authorized them – sometimes for multiple business days.  By holding transactions rather than posting them immediately to an account, Arvest was able to amass several transactions. Subsequently, Arvest posted all of the amassed transactions on a single date.  When the group of transactions was eventually posted to the customer's account, Arvest posted them in order of largest to smallest – not in the order in which they were received or in the order in which they were made.  This delayed posting resulted in the imposition of multiple overdraft fees that would not otherwise have been imposed.   The delayed posting also prevented customers from ascertaining the accurate balances in their accounts.

52.    Arvest's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, was specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.  Arvest would have had no higher expenses and would not have faced greater risk if it had ordered transactions chronologically or from smallest to largest.

53.    Arvest enforced this policy whereby transactions were posted to customers' accounts in a non-chronological order, from highest to lowest, and were held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  Arvest's processing practices substantially increased the likelihood that customers' smaller charges would

result in multiple overdraft fees.  The practices provided Arvest with substantially higher service fee revenues than it would otherwise achieved absent these practices.

54.     As a result of these and other practices, Plaintiffs and members of the Classes have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

**D.     Arvest's Cloaking of Accurate Balance Information.**

55.     Arvest actively promoted the convenience of its debit cards and other electronic debiting, but failed to provide customers with accurate balance information.  When customers execute account transactions, they generally did not have access to an accurate balance register or balance information.

56.     Arvest provided inaccurate balance information to its customers through its electronic network.  In certain cases, Arvest informed its customers that they had a positive balance when, in reality, they had a negative balance pursuant to Defendants' manipulations of the customer's transactions, and despite Defendants' actual knowledge of all outstanding debits and transactions.

57.     Arvest also organized its customers' balance information on its website in chronological order even though it actually posted transactions in "high to low" order.  By displaying transactions in an order that was directly contrary to the way in which they were actually posted, Arvest caused great confusion to its customers.

58.     Furthermore, for a substantial portion of the Class Period, Arvest generated confusion by formatting monthly statements to hide its true ordering practices.

59.     Even when Arvest had actual knowledge of outstanding transactions which had already created a negative available balance in a customers' account, it encouraged the customer

to incur more overdraft charges by approving – rather than prudently declining – subsequent debit card purchases and other electronic transactions.

### E. Arvest's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out.

60.     At the time its debit cards are used in POS transactions or at ATMs, Arvest is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.   Defendant has, and has always had, the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.  Prior to the effective date of the opt in/opt out requirements of the Electronic Funds Transfer Act ("EFTA"), Arvest could have given customers the option to decline the transaction to avoid incurring overdraft fees, but it failed to do so because it sought to maximize the amount of revenue generated through its assessment of overdraft fees.  These practices violated the Bank's contracts.

61.     Notwithstanding its technological capabilities and actual knowledge, Arvest failed to provide notice to Plaintiffs and the Classes that a particular debit card transaction would result in an overdraft and, hence, an overdraft fee.  Because Arvest's customers were not notified of the potential overdraft, and were not given the option of declining the debit card transaction or providing another form of payment, the customers were assessed monetary damages in the form of overdraft fees that violated the Bank's contracts.

62.     Until 2010, when it was under a federal mandate to do so as a result of recently adopted legislation, Arvest failed to make Plaintiffs and members of the Classes aware that they could opt out of its overdraft scheme upon request, thereby avoiding overdraft fees on debit card transactions.

**F.**   **Arvest's Overdraft Policies and Practices Are Contrary to Best Practices.**

63.   By engaging in the conduct described herein, Arvest has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively the "Agencies").   A copy of the Joint Guidance is attached as Exhibit C.   These "best practice" recommendations include: "Provide election or opt-out of service.   Obtain affirmative consent of consumers to receive overdraft protection.   Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."   70 F.R. 9127-01, 9132.

64.   According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits . . . .   This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."   73 F.R. 28904-01, 28929 (May 19, 2008).

65.   The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.   When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."   70 F.R. 9127, 9132.   The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."   *Id.*

66.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee. A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit D.

67.     Arvest's overdraft policies made it difficult for customers to avoid injury even if they carefully tracked the balance in their account. In fact, the Agencies have stated that injury resulting from such policies, "is not reasonably avoidable" by the consumer. 73 F.R. 28904-01, 28929. "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out. Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account. For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

68.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years." The report, attached hereto as Exhibit E, found that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program." The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee." The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12-month period, with 27 million accounts incurring five or more overdraft fees.

69.     A chart from the research company Moebs Services shows that, in every year from 1992 to 2009, banks gained increased revenues from overdraft fees:



G.     **Arvest's Unconscionable Contractual Provisions and Policies.**

70.     Arvest's contracts and overdraft policies and practices are unconscionable in the following respects, among others:

      a.     Prior to the effective date of the EFTA, Arvest did not disclose or reasonably disclose to customers that they had the option to "opt out" of the overdraft scheme;

b.      Prior to the effective date of the EFTA, Arvest did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

c.      Arvest did not alert customers that a debit card transaction would trigger an overdraft, and did not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.      Defendant used unduly discretionary power to assess fees even at times when no economic argument could be made for such fees;

e.      To the extent Arvest claims its overdraft practices were the result of its power to amend its contracts at will and without proper notice to customers;

f.      The account agreement and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by Defendant, which is a party of vastly superior bargaining strength, and only relegate to the customer the opportunity to adhere to them or reject the agreement and related documents in their entirety; and

g.      To the extent they allow the improper overdraft fees described herein, the account agreement and debit card agreement are ineffective, ambiguous, deceptive, unfair, and misleading.

**H.      Arvest's Overdraft Practices Harmed Plaintiffs and the Classes.**

71.      Arvest's wrongful overdraft policies and practices described above harmed Plaintiffs and members of the Classes.

72.      Mr. Hajny and J&J are former checking account customer of Arvest.  Plaintiffs both held Arvest checking accounts that were subject to the same relevant contractual provisions in Arvest's form account agreement.

73.     Arvest issued debit cards to Plaintiffs in connection with these accounts.  Both accounts were subject to the same relevant contractual provisions in Arvest's form debit card agreement.

74.     On multiple occasions, Arvest wrongfully assessed overdraft fees against both checking accounts.

75.     For example, overdrafts were charged against debit card, as opposed to check, transactions in violation of the parties' contracts.  Further, Arvest authorized debit transactions even when, according to the Bank's internal calculations, funds were not available to cover the transaction. The Bank then assessed an overdraft fee.

76.     The Bank also manipulated Plaintiffs' transactions by reordering them from highest to lowest based on the dollar amounts of the transactions.  Arvest manipulated Plaintiffs' transactions in this manner for the purpose of generating additional overdraft occurrences.  The Bank also did so in a very deceptive manner because Plaintiffs saw transactions in one order on the Bank's website and then, when Mr. Hajny would log on a day or two later, the transactions had been rearranged to increase the number of overdraft fees charged.  On multiple occasions Plaintiffs confronted Bank employees about these practices.   Arvest personnel refused to acknowledge that the Bank's practices were improper.

77.     Arvest has also assessed overdraft fees even at times when Plaintiffs had positive balances of actual funds in their accounts.

78.     Plaintiffs were also victims of the other improper practices described above.

79.     If Arvest had not violated its contracts and otherwise improperly assessed overdraft fees, Plaintiffs would not have been assessed as many overdraft fees.

80.     In 2010, in an attempt to comply with Reg E, the Bank did provide Plaintiffs with a notice about opting in to the Bank's debit card overdraft program.  The notice was wholly insufficient because it did not reveal many of the Bank's actual practices, such as the manipulation of transactions.  Based on the Bank's misleading notice, Plaintiffs did opt in to the program by clicking a box at Arvest's online banking website.  The notices and opt in were not contractual in nature, however, and did not vary the parties' agreements.  Further, the notice did not disclose any of the Bank's actual practices, other than the possibility that the Bank might cover debit card transactions at times when enough funds were not present in the account.  Under no circumstances did Plaintiffs opt in to any other aspect of the Bank's overdraft practices.

81.     The overdraft fees assessed Plaintiffs are representative of millions of dollars of overdraft fees that Arvest wrongfully assessed and deducted from its customers' accounts.  These wrongful takings are especially egregious considering the fact that Defendant approved each transaction and often knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

### I.     The Damages Sustained by Plaintiffs and the Classes.

82.     Arvest's overdraft policies made it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account.  In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  "It appears that customers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although customers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, customers often lack sufficient information about key aspects of their account.  For example, a customer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available." *Id*.

83.     Thus, as a consequence of Arvest's overdraft policies and practices, Plaintiffs and the Classes have been wrongfully forced to pay overdraft fees.  Arvest has improperly deprived Plaintiffs and the Classes of significant funds, causing ascertainable monetary losses and damages.

84.     As a consequence of Arvest's improper overdraft fees, Arvest has wrongfully deprived Plaintiffs and the Classes of funds to which it had no legitimate claim.

85.     Plaintiffs had sufficient funds to cover at least some of the transactions for which they were charged overdraft fees.  Plaintiffs and members of the Classes either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that Arvest could impose these wrongful charges.  In many instances, Arvest's manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiffs and the members of the Classes.

## FIRST CLAIM FOR RELIEF
### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

86.     Plaintiffs repeat paragraphs 1 through 85 above.

87.     Plaintiffs and Arvest have contracted for bank account services, including checking, ATM, and debit card services.  As described above, the actions taken by Arvest have violated the specific terms of the account agreement and debit card agreement with customers.

88.     For example, each time the Bank assessed an overdraft fee against a non-check debit card transaction, it violated the account agreement.  Arvest violated other terms of the account agreement.

89.     Arvest also violated the terms of the debit card agreement. For example, each time the Bank approved a transaction that it knew would result in an overdraft fee, it violated the debit card agreement. Arvest violated other terms of the debit card agreement.

90.     Arvest has further breached the account agreement and debit card agreement based on its violations of the covenant of good faith and fair dealing. Under the laws of Arkansas, Kansas, Missouri, and Oklahoma, good faith is an element of every contract pertaining to the assessment of overdraft fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

91.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

92.     Arvest has breached the account agreement and debit card agreement with its customers by breaching the covenant of good faith and fair dealing through its overdraft policies and practices as alleged herein.

93.     Plaintiffs and the members of the Improper Overdraft Class have performed all, or substantially all, of the obligations imposed on them under the account agreement and debit card agreement.

94.     Plaintiffs and the members of the Improper Overdraft Class have sustained damages as a result of Arvest's breaches of the account agreement and debit card agreement and further breaches of the account agreement and debit card agreement as interpreted in accordance with the covenant of good faith and fair dealing.

<u>**SECOND CLAIM FOR RELIEF**</u>
<u>**Unconscionability**</u>

95.     Plaintiffs repeat paragraphs 1 through 85 above.

96.     Arvest's form contracts and overdraft policies and practices are substantively and procedurally unconscionable in the following respects, among others:

a.      Prior to the effective date of EFTA, Defendant did not disclose or reasonably disclose to customers that they could "opt out" of the overdraft scheme;

b.      Prior to the effective date of EFTA, Defendant did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

c.      Defendant did not alert its customers that a debit card transaction would trigger an overdraft, and did not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.      The account agreement and debit card agreement are contracts of adhesion in that they are standardized forms, imposed and drafted by Defendant, which is a party of vastly superior bargaining strength, and only relegate to the customer the opportunity to adhere to them or reject them in their entirety;

e.   The account agreement and debit card agreement provided to customers are ineffective, ambiguous, deceptive, unfair, and misleading in that, to any extent they give the Bank the right to impose the various overdraft policies described herein, they do so in a way that grossly unfair, because the Bank's actual practices are never disclosed or permitted.

97.   Considering the great business acumen and experience of Arvest in relation to Plaintiffs and the members of the Classes, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

98.   Plaintiffs and members of the Classes have sustained damages as a result of Arvest's unconscionable policies and practices as alleged herein.

### THIRD CLAIM FOR RELIEF
#### Unjust Enrichment

99.   Plaintiffs repeat paragraphs 1 through 85 above.

100.   Plaintiffs, on behalf of themselves and the Classes, assert a common law claim for unjust enrichment. This claim is brought solely in the alternative and Plaintiffs concede that this claim cannot survive if their contractual claims succeed. If, however, the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason, unjust enrichment will dictate that Arvest disgorge all improperly assessed overdraft fees.

101.   By means of Arvest's wrongful conduct alleged herein, Arvest knowingly assessed fees upon Plaintiffs and members of the Classes that are unfair, unconscionable, and oppressive.

102.    Arvest knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Classes.  In so doing, Arvest acted with conscious disregard for the rights of Plaintiffs and members of the Classes.

103.    As a result of Arvest's wrongful conduct as alleged herein, Arvest has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Classes.

104.    Arvest's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

105.    Under the common law doctrine of unjust enrichment, it is inequitable for Arvest to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiffs and members of the Classes in an unfair, unconscionable, and oppressive manner.  Arvest's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

106.    The financial benefits derived by Arvest rightfully belong to Plaintiffs and members of the Classes.  Arvest should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Classes all wrongful or inequitable proceeds received by them.  A constructive trust should be imposed upon all wrongful or inequitable sums received by Arvest traceable to Plaintiffs and the members of the Classes.

107.    Plaintiffs and members of the Classes have no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Electronic Funds Transfer Act and Its Regulations**
**15 U.S.C. § 1693 and 12 C.F.C. § 205**

108.    Plaintiffs repeat paragraphs 1 through 107 above.

109.    Plaintiff Hajny alleges this claim on behalf of himself and the EFTA Class members who have been assessed one or more overdraft fees or charges based on ATM or debit card transactions.

110.    Plaintiff Hajny, on behalf of himself and the EFTA Class, asserts that Arvest failed to:

      a.    Provide its customers with a notice describing its overdraft services that complies with 12 C.F.R. §§ 205.17(b)(1)(i), (d);

      b.    Provide its customers with a reasonable opportunity to affirmatively consent, or opt in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(ii);

      c.    Obtain its customers' affirmative consent, or opt-in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(iii); or

      d.    Provide its customers with confirmation of their consent in accordance with 12 C.F.R. § 205.17(b)(1)(iv).

111.    Nonetheless, Arvest imposed overdraft fees on customers based on ATM or debit card transactions in violation of 12 C.F.R. §§ 205.17(b), (c).

112.    As a result of Arvest's violations of EFTA, Defendant is liable to Plaintiff Hajny and the EFTA Class for actual and statutory damages pursuant to 15 U.S.C. § 1693m.

113.    As a result of Arvest's violations of EFTA, Defendant is liable to Plaintiff Hajny and the EFTA Class for actual and statutory damages and Plaintiff and the Class are entitled to recover costs of suit and their reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.      Awarding actual damages in an amount according to proof;

2.      Awarding restitution of all improper overdraft fees paid to Arvest by Plaintiffs and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.      Compelling disgorgement of the ill-gotten gains derived by Arvest from its misconduct;

4.      Awarding punitive and exemplary damages;

5.      Awarding statutory damages;

6.      Awarding pre-judgment interest at the maximum rate permitted by applicable law;

7.      Reimbursing all costs and disbursements accrued by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.      Awarding such other relief as this Court deems just and proper.

Dated:  December 31, 2013.

Respectfully submitted,

BY:   WATSON BURNS, PLLC

/s/ Frank Watson, III
Frank Watson, III (Tenn Bar No. 15073)
253 Adams Avenue
Memphis, Tennessee 38103
(901) 529-7996
(901) 529-7998 (fax)
fwatson@watsonburns.com

E. Adam Webb (Georgia Bar No. 743910)*
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.; Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com

*Attorneys for Plaintiffs*

* *Pro hac vice* application to be promptly filed

# EXHIBIT "A"

# IMPORTANT INFORMATION ABOUT
# OPENING AN ACCOUNT



The USA Patriot Act and the related rules and regulations requires all financial institutions to verify the identity of customers in certain situations, as defined by law.  Customers include, but are not limited to, deposit account holders, borrowers, guarantors of credit, parties in trust, purchasers of investment products and signers on deposit accounts and loans.  We are required to ask you to provide your name, current address, social security number or other government issued identifying number and date of birth.  You may be asked to provide proof of your identity, such as a valid driver's license, passport (and country of issuance), or other government issued photo identification documenting evidence of nationality and residence.  The information you provide to us may be verified using one or more methods.  For instance we may compare it against public databases of information to determine that it is valid.  We may also ask you additional questions after the time of your transactions concerning the information requested.  If the information cannot be verified satisfactorily, your account may be restricted or closed.

USPatriotAct 2005

## Account Information Line

Account Information Line is the automated customer service line. A touch-tone phone is all you need to give you current account/card information.You may access information about: checking, savings, spending card, money market accounts, loan information, current interest rates, andincoming direct deposit amounts, branch locations and hours.

By choosing a Personal Identification number (PIN) for Account Information Line, I agree and understand that this number will allow me access tomy accounts/cards when I call the Account Information Line.

The Bank reserves the right to refuse to release this number to the owner(s) of the account(s)/card(s) whether in person, by telephone, or by letter.If the number is lost or stolen, I will contact the Bank immediately to select a new number.

I understand that my Personal Indentification number (PIN) should be kept confidential and not disclosed to any party that is not an account/cardowner. Disclosure of my Personal Identification number (PIN) to another party is considered implied consent and the Bank will not be liable for anytransactions conducted due to disclosure of your Personal Identification number (PIN). For my protection, my account information line will bedeactivated if not used within

## Banking on the Net Agreement

I am requesting the above named accounts be included in the Arvest Banking on the Net service. I understand that access to this service is controlled by Logon ID(s) and Password(s). The security of the Logon ID(s) and Password(s) shall be my sole responsibility and I agree to keep the Logon ID(s) and Password(s) confidential and not to disclose them to any unauthorized person. The Bank shall not be liable to me for any loss or damage sustained by me or any third party resulting from, or arising out of, my failure to safeguard the confidentiality of the Logon ID(s) and Password(s). I agree to change my Password(s) on a regularly scheduled basis or in the event I feel my password(s) may have become compromised, I agree to promptly change my Password(s) and notify the Bank. The Bank shall not be liable to me or any third party for any loss or damage resulting from, or arising out of, my failure to do so.

If I utilize the Bill Payment Services, I authorize Arvest Bank to post the bill payment transactions by electronic transfer, a draft without signature, or a debit to the account. If I elect to terminate this service, a ten day(10) written notice must be provided to Arvest Bank.

All applicable portions of the agreement shall remain in effect with respect to any entries initiated by me prior to such termination. This agreement does not supersede any signature card rules and regulations, depository agreements, or any other agreements I may have with the Bank. All account agreements and rules now or hereafter governing my accounts will remain in full force and effect after the execution of this agreement.

We may discontinue your Banking on the Net for any reason, including non-usage or 180 days of inactivity, at any  time.

My use of this service signifies that I have read and accepted the terms and conditions of Arvest Banking on the Net and Bill Payer Services. These terms and conditions can be located on the sign-on page for Arvest Banking on the Net services.

## Application for Electronic Access Device

Depositor (whether one or more) hereby applies to Bank for an electronic access device ("Access Device"), and additional Access Devices for the authorized person(s) indicated below, to access the accounts listed below and to perform such other banking functions with the Access Device as are described in the Electronic Fund Transfers Agreement and Disclosure. If there are questions about this Application, Bank may contact Depositor at the address shown above, or at the following telephone number:   (877) 618-2648

Depositor, and any authorized person(s) indicated above, have received a copy of the Electronic Fund Transfers Agreement and Disclosure and agree to be bound by the terms and conditions contained therein, as they may be amended from time to time by Bank, and to pay all fees that may be assessed in connection with the issuance, maintenance, and/or use of the Access Device(s).  Depositor also authorizes Bank to check credit and employment history should it deem necessary.

## Substitute Form W-9 Certifications

Under penalties of perjury, I _____**Arvest Applicant(s)**_____ certify each of the following statements beside which an "X" appears:

☒  _____**SSN(s) Provided**_____ is my correct taxpayer identification number (or I am waiting for a number to be issued to me).

☒  I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.

☒  I am a U.S. person (including a U.S. resident alien).

## Deposit Agreement

In consideration of Bank's agreement to open this account, and other value received by each of us, the Depositor (whether one or more) agrees to the terms stated on this form and acknowledges receipt of this Deposit Agreement & Terms and Conditions and other applicable disclosures. In the event of a conflict or inconsistency between the terms of any separately receipted document and this Agreement, the term of the separately receipted document shall govern and control. Depositor also authorizes Bank to check Credit and Employment history should it deem necessary. The terms and conditions of all receipted documents, together with all terms and conditions stated hereof, are incorporated herein by this reference.

## Terms and Conditions

**GENERAL PROVISIONS** - The following printed terms, and those on any separate agreements and disclosures (the terms and conditions of which have been incorporated herein), will govern the operation of this account, unless clearly varied in writing or typing. "We," "our," or "us" means the depository institution and "you" means the Depositor, or as Depositor, if more than one. This agreement includes your promise to pay the charges for check orders and other charges as shown on the Schedule of Fees and Charges and your permission for us to deduct these charges, as we earn them, directly from the account balance. You also agree to pay any additional reasonable charges we may impose for services you request which are not contemplated by this agreement. Each of you agrees to be jointly and severally liable for any account deficit resulting from charges or overdrafts, together with the costs we incur to collect the deficit including, to the extent permitted by law, our reasonable attorneys' fees. We will not be liable for dishonor of your checks or other items resulting from our deduction of any such charges and, to the extent permitted by law, collection costs and reasonable attorneys' fees. This agreement is governed by state and federal law and regulations and applicable clearinghouse rules, except to the extent that this agreement can and does vary such rules or law.

**OWNERSHIP OF ACCOUNT** - The following provisions explain the rules applicable to this account depending on the form of ownership specified on the reverse side. Only the portion corresponding to the form of ownership specified will apply. **Individual Account** - This account is owned by one person who does not intend any rights to the account in any other person. **Multiple Party Account - With Survivorship** - This account is owned in the name of two or more persons. Each owner intends that upon death the balance in the account, subject to any outstanding pledge to which we have consented, will belong to the survivor(s), and will not be inherited by the heirs of the deceased owner or controlled by the deceased owner's will. If two or more owners survive, the survivors will own the account equally with survivorship, unless otherwise required by applicable law. **Multiple Party Account - No Survivorship** - This account is owned by two or more persons, none of whom intend to create any right of survivorship in any other person. **Revocable (Totten) Trust or Pay-On-Death Account** - This account is owned by one or more persons/trustees who create this account. If two or more owners/trustees create this account, it is a multiple party account with survivorship and will not be inherited by the heirs of the deceased owner/trustee or controlled by the deceased owner's/trustee's will. The named beneficiary will acquire rights to the account only upon the death of all owners/trustees, and provided the beneficiary is then alive. In the case of two or more surviving beneficiaries, the account will become a multiple party account with survivorship. The account owner(s)/trustee(s) reserve(s) the right, at any time, to change beneficiaries, account type, and/or account ownership, and to withdraw all or part of the account balance. **Custodian Under Uniform Transfers to Minors Act** - The funds deposited to this account, together with all earnings and additions, constitute an irrevocable gift to the named Minor, to be administered by the named Custodian under the Arkansas Uniform Transfers to Minors Act, the terms and provisions of which are incorporated herein by reference. **Fiduciary Account** - The named representative(s) exercise(s) control over these accounts for the benefit of third party(ies), and the fiduciary relationship is established other than by this agreement. **Organization Account** - This account is owned by the named organization, which acts through its authorized representatives. The governing body of the organization shall provide us with an authorization, in a form acceptable to us, telling us who is authorized to act in its behalf. We will honor this authorization until we actually receive written notice of a change from the governing body. We are not responsible for any transaction conducted by a previously authorized representative if we have not actually received written notice from the governing body of the organization that the representative is no longer authorized to transact on its behalf.

**DEPOSITS** - In receiving items for deposit or collection, we act only as your collecting agent and assume no responsibility beyond the exercise of ordinary care. We are not liable for default or negligence of our duly selected correspondents, nor for losses in transit, and each correspondent is not liable except for its own negligence. Any items accepted for deposit (including items drawn "on us") will be given provisional credit only until collection is final and in U.S. dollars. We are not responsible for any transactions (including any deposits made at an outside depository) until we actually record them. You agree to assume liability for any endorsement that violates the standards prescribed by Federal law or regulation.

**WITHDRAWALS** - Unless otherwise indicated on the reverse side, any one of you who signs this agreement, as a Depositor or otherwise, may withdraw or transfer all or any part of the account balance at any time on forms approved by us. Each of you authorizes each other person signing this agreement to endorse any item payable to you or your order for deposit to this account or any other transaction with us, until we receive actual notice to the contrary. A check that will overdraw the available account balance will trigger a service charge, whether we pay the item or dishonor it. We may, at our option and in lieu of other charges in connection with an overdraft, charge interest on the overdraft at a rate not to exceed the maximum legal rate until paid. You agree, immediately upon notice from us, to deposit funds sufficient to cover any overdraft plus service charges. In connection with overdrafts, our determination of the account balance may be made at any time between presentment and our midnight deadline, and will only be made once. The fact that we may honor withdrawal requests which overdraw the available account balance does not obligate us to do so. We will not be obligated to honor such requests unless required by law or by another agreement we have with you. We reserve the right to disregard any information on the check other than the drawer's signature, the payee, the amount, and any magnetically-encoded information at the bottom of the check. Except as provided under state law, unless previously agreed to by us in writing, we will not be liable for payment of any post-dated item, or for payment of any item bearing on its face any conditional statement or restriction such as "Void after 90 days", "Void over $100", "Paid in full", or "Two signatures required". If we pay any such item, we may charge the full amount of that item to your account. We may refuse any withdrawal or transfer request which is for an amount less than any minimum withdrawal requirement or which exceeds any frequency limitation. If you fail to observe these stated account limitations, we may close this account. We will use the date a transaction is completed by us (and not the day you initiate it) to apply the frequency limitations. On interest-bearing accounts other than time deposits, we reserve the right to require at least seven days' written notice before any withdrawal or transfer. Withdrawals from a time deposit prior to maturity or prior to the expiration of any notice period may be restricted or prohibited and, if consented to by us, may be subject to a substantial penalty.

**WHOLESALE WIRE AND ACH TRANSACTIONS** - With respect to wire transfers or other transfers of funds not governed by the Electronic Funds Transfer Act, you agree to enter into and comply with our wire transfer (if applicable) agreement and to comply with our security procedures and this section. We advise you that any receiving financial institution (including us) is entitled to rely on any account or bank number you have provided even though that account or bank number may identify a party different from the person or entity you have described by name in any transfer order. **Provisional Payment** - Credit given by us to you with respect to an automated clearing house credit or wholesale (wire) funds transfer entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to this account in connection with such entry, and the party (the originator of the entry) making payment to you via such entry shall not be deemed to have paid you the amount of such entry. **Notice of Receipt** - We will notify you of the receipt of payments in the periodic account statements we provide to you. You acknowledge that we will not give you oral day notice to you of receipt of an automated clearing house or wholesale (wire) funds transfer item.

**ELECTRONIC CHECK CONVERSION** - You may authorize a merchant to use your check as a source of account information to initiate an electronic withdrawal from your account. The merchant uses the check information, along with the transaction amount, to initiate an ACH debit transaction. The transaction is electronically transferred through the ACH system and the funds will be debited directly from your account and deposited automatically into the merchant's account. After the information is gathered from the check, the merchant should mark it void and return it to you. You should sign and receive a receipt documenting the transaction. A description of the transaction will appear on your monthly statement from us. Checks used in these types of transactions will not be returned with your statement. If you authorize a merchant to use your check for this type of transaction, the transfer is governed by the Electronic Funds Transfer Act and subject to the Electronic Funds Transfer Agreement and Disclosure.

**RE-PRESENTED CHECKS** - A merchant may also re-present a check returned for insufficient or uncollected funds electronically. The merchant must provide notice to you, before accepting your check, that your returned check may be collected electronically. Checks used in these types of transactions will not be returned with your statement. When a merchant re-presents a check electronically, that transaction is not covered by the Electronic Funds Transfer Act. However, if the merchant charges you a fee as a result of the returned check and the fee is electronically debited from your account that transfer will be covered by the Electronic Funds Transfer Act and subject to the Electronic Funds Transfer Agreement and Disclosure.

**ACCOUNT TERMS, AMENDMENTS, AND TERMINATION** - This account is subject to charges, interest rates, and minimum balance requirements established from time to time by us. We may change such applicable charges, interest rates, and minimum balance requirements, or any other account terms, at any time, after such notice, if any, as is required by law, or if there is no specific requirement of law, then after reasonable notice. Notice from us to any one of you is notice to all of you. This account relationship may be terminated by us at any time and without previous notice by mailing notice thereof and a check for the account balance, if any, to you at your address as shown on our records on the date of mailing. This account may not be transferred or assigned without our written consent.

**STOP PAYMENTS** - Any one of you can order us to stop payment on a check drawn on your account. In order to place a stop payment order, you must inform us of the **exact** amount of the check, the number of the check, the number of the account and the name of the payee; otherwise, we may not catch your stop order. We will not be responsible if the check in question is not described with reasonable certainty, and we are entitled to a reasonable period of time after you give us a stop order to notify our employees. Oral stop payment requests are effective for fourteen (14) days unless confirmed by written order; written stop payment orders are effective for six (6) months and may be renewed. There is a charge for each stop payment request. You agree to hold us harmless for all liability, expense, and cost we incur because we refuse to pay the check, except for our failure to exercise ordinary care. If we recredit your account after paying a check over a valid and timely stop order, you agree to sign a statement describing the dispute with the payee, to transfer to us all of your rights against the payee or other holder of the check, and to assist us in legal action taken against that person. No stop payment orders are allowed on cashier's checks, teller's checks, or certified checks, except as provided or required by law.

**STATEMENTS** - If periodic statements are generated for this account, such statements will be mailed to you at the address shown on our records unless you otherwise instruct us. Examine your statement carefully upon receipt and reconcile your account. Notify us promptly of any error or unauthorized signature or alteration. If you do not notify us of an unauthorized signature or alteration promptly, you cannot assert the unauthorized signature or alteration against us if we suffered a loss by reason of your failure to do so. If you do not notify us of an unauthorized signature or alteration within a reasonable time (not to exceed 30 calendar days) after we send or make available to you your statement and (if applicable) accompanying items, you cannot assert an unauthorized signatures or alterations by the same wrongdoer on any items paid by us after the reasonable time mentioned above elapses, but before we receive notice from you.

**DIRECT DEPOSITS** - If we deposit any amount in this account which should have been returned to the State or Federal Government for any reason, you authorize us to deduct the amount of our liability to the State or Federal Government from this account or from any other account you have with us, without prior notice and at any time, except as prohibited by law. We may also use any other legal remedy to recover the amount of our liability.

**SET-OFF** - By signing this form, for value received, you each grant to us a security interest in the account and in addition agree that we have the right (without prior notice and when permitted by law) to set-off the funds in this account against any due and payable indebtedness owed to us now or in the future by any of you, either individually or jointly. We may set-off any debt owed to us by any one or more of you without regard to the ownership or source of the funds in the account and without requirement that the debt be owed to us by all of you rather than only some of you. This right of set-off does not apply to this account to the extent restricted or prohibited by law or contract. You agree to hold us harmless from any claim arising from exercise of our right of setoff.

**DORMANT ACCOUNTS** - We may, after a reasonable period of inactivity, consider your account dormant. Dormant accounts (if interest-bearing) will continue to earn interest, and will be subject to such maintenance and service charges as may be shown on the Schedule of Fees and Charges. We will mail periodic statements for dormant accounts. We may define dormancy differently than as defined by applicable state law.

**ADDITIONAL ACCOUNT TERMS** - This agreement is governed by the laws of the State of Arkansas. If you are opening an interest bearing account, you hereby acknowledge and accept the qualifications and/or terms as set forth within the Truth in Savings Disclosure. If you are opening a time deposit account, this agreement is applicable to that account and any future book entry receipts of identical ownership.

OAONonAR.pdf 04/29/09 @ 15:04

# EXHIBIT "B"

# ELECTRONIC FUND TRANSFERS
# AGREEMENT AND DISCLOSURE

**ARVEST**
**BANK**  MEMBER **FDIC**



### Agreement and Disclosure

Depositor ("you" or "your") has requested that Financial Institution ("Financial Institution" "we" or "us") permit you to access an electronic funds transfer system and (if applicable) that Financial Institution issue you an automated teller card, debit card, code or other device ("Access Device") to transact on your account.  By requesting, receiving, signing, using, authorizing another to use or otherwise accepting the Access Device (if applicable, and including any replacement or substitute Access Device) or the electronic funds transfer system, you, and any authorized signers, agree to be bound by the following rules and regulations:

1.  You are responsible and liable for all authorized transactions made through the use of the Access Device and for all authorized transactions made under any preauthorized transfer.  All such transactions are subject to all applicable agreements, rules and regulations of Financial Institution's checking accounts and savings accounts for which Access Device use or preauthorized transfers are authorized, now or in the future, as said agreements, rules and regulations are now in effect or as they may hereafter be amended, modified, or adopted.

2.  You authorize the Financial Institution to charge your checking account(s) and savings account(s) for all authorized transactions resulting from the use of the Access Device or resulting from any preauthorized transfer and you assume all responsibility and liability for all such Access Device use and preauthorized transfers. You may authorize a merchant or other payee to make a one-time electronic payment from your checking account using information from your check to (i) pay for purchases (ii) pay bills.

3.  Financial Institution will assign you a "Personal Identification Number" (PIN) to enable you to be identified when using the Access Device.  The Access Device and the number are to be used as instructed and you agree not to disclose in any manner whatsoever the Personal Identification Number (PIN) to anyone other than authorized users of the Access Device.

4.  Tell us AT ONCE if you believe your Access Device has been lost or stolen.  Telephoning is the best way of keeping your possible losses down.  You could lose all the money in your account (plus your maximum overdraft line of credit, if any).  If you tell us within two business days after you learn of the loss or theft of your Access Device, you can lose no more than **$50.00** if someone used your Access Device without your permission.

If you do NOT tell us within 2 business days after you learn of the loss or theft of your Access Device, and we can prove we could have stopped someone from using your Access Device without your permission if you had told us, you could lose as much as **$500.00**.

Also, if your statement shows transfers that you did not make, tell us at once.  If you do not tell us within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time.

If a good reason such as a long trip or a hospital stay kept you from telling us, we will extend the time periods.

5.  If you believe your Access Device has been lost or stolen or that someone has transferred or may transfer money from your account without your permission, call:  (866) 960-8367
or write:   Arvest Bank
            PO Box 2103
            Lowell, AR 72745

6.  Our business days are Monday through Friday.  Holidays are not included.
7.  Transaction information.

| | |
|---|---|
| You may use your Access Device to:<br>* Deposit Funds      * Withdraw Funds<br>* Balance Inquiries   * Transfer Funds<br>* Access Overdraft Protection<br>\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*<br>You may not use your ATM/CheckCard for Internet Gambling Transactions. ATM / CheckCards that have not been used within the last 12 mos. or tied to accounts which have a zero balance for 90 consecutive days will be deactivated. ATM and CheckCards tied to an account which becomes dormant due to lack of activity will be deactivated.<br><br>\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*<br>When using your Arvest CheckCard you may perform pinned based transactions (POS and ATM) up to $1,500.00 and signature purchase up to $2,500.00 per business day. | Your account is subject to the following transaction limitations, which may restrict your ability to make electronic fund transfers:<br><br>Account limitations vary based on type of account accessed by card.  See account disclosure (available upon request) for details.<br><br>For point of sale transactions where no personal identification number (PIN) is entered, transactions may be processed as Visa Check Card transactions or they may be processed as PIN less transactions on the PULSE network.  Merchants must provide you with a clear way of choosing to make a Visa Check Card transaction if they support this option.  Please be advised that, if you choose to use PULSE, different terms may apply from those on transactions processed over the Visa network.  Certain protections and rights applicable only to Visa Check Card transactions will not apply to transactions processed on the PULSE network.  For example, while Regulation E will apply to a PULSE transaction, Visa's Zero Liability policy will not. |

You may withdraw up to $600.00 per business day (but not more than the funds available in the account for withdrawal) from an electronic terminal that accepts your Arvest ATM Card.

You may arrange with others in writing for preauthorized transfers, to or from your checking or savings accounts.  For example, you may arrange with others for direct deposit into your account of payroll, Social Security, or pension benefit checks, or for the automatic payment from your account of utility bills, insurance premiums, or mortgage payments.

8.  You will be charged for each transfer/transaction as disclosed on the Schedule of Fees and Charges.  In addition, when you use an automated teller machine not owned by us, you may be charged a fee by the automated teller machine operator or any network used (and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer).

OAONonAR.pdf 04/29/09 @ 15:04

9.  You can get a receipt at the time you make any transfer to or from your account using an electronic terminal that accepts your Access Device.

If you have arranged with others to have direct deposits made to your account at least once every 60 days from the same person or company, you can call us at the telephone number in Paragraph 5 to find out whether or not the deposit has been made.

You will get a monthly account statement unless there are no transfers in a particular month.  In any case, you will get an account statement at least quarterly.  These statements will show electronic funds transfers to or from your account.  If you have a passbook account where the only possible electronic funds transfers are preauthorized credits, and you bring your passbook to us, we will record any electronic deposits that were made to your account since the last time you brought in your passbook.

10.  If you have authorized regular payments to be made out of your account, you can stop any of these payments.  Here's how:

Call us or write us at the number or address in Paragraph 5, in time for us to receive your request 3 business days or more before the payment is scheduled to be made.  If you call, we may also require you to put your request in writing and get it to us within 14 days after you call.  We will charge you for each stop payment you order, as disclosed on the Schedule of Fees and Charges.

If these regular payments may vary in amount, the person you are going to pay will tell you, 10 days before each payment, when it will be made and how much it will be.  You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.

If you order us to stop one of these payments, 3 business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

11.  We will disclose information to third parties about your account or the transfers you make:
    (1)  Where it is necessary for completing transfers, or
    (2)  In order to verify the existence and condition of your account for a third party, such as a credit bureau or merchant, or
    (3)  In order to comply with government agency or court orders, or
    (4)  If you give us your written permission.

12.  **In Case Of Errors Or Questions About Your Electronic Transfers.**  Telephone us, write us or e-mail us at the number, address or e-mail address in Paragraph 5 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt.  We must hear from you no later than 60 days after we sent the FIRST statement on which the problem or error appeared.
    (1)  Tell us your name and account number (if any).
    (2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is in error or why you need more information.
        Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days.

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly.  If we need more time, however, we may take up to 45 days to investigate your complaint or question.  If we decide to do this, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.  If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.

For errors involving new accounts, point-of-sale, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint or question.  For new accounts, we may take up to 20 business days to credit your account for the amount you think is in error.

We will tell you the results within three business days after completing our investigation.  If we decide that there was no error, we will send you a written explanation.  You may ask for copies of the documents that we used in our investigation.

13.  If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages.  However, there are some exceptions.  We will not be liable for instance:
    (1)  If through no fault of ours, you do not have enough available funds in your account to make the transfer.
    (2)  If the money in your account is subject to legal process or other encumbrances restricting the transfer.
    (3)  If the automated teller machine where you are making the transfer does not have enough cash.
    (4)  If circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken.
    (5)  If the terminal was not working properly and you knew about the breakdown when you started the transfer.
    (6)  If incomplete or inaccurate information is forwarded by the United States Treasury or through an automated clearing house.

14.  A fee may be imposed by an automated teller machine operator (as defined under 15 USC § 1693b(d)(3)(D)(i)) if you initiate a transfer from an automated teller machine that is not operated by us (or the financial institution issuing the card or other means of access); and any national, regional or local network utilized to effect the transaction.

15.  All deposits, payments and transfers made through the use of your Access Device or by a preauthorized transfer are subject to proof and verification by Financial Institution.  Deposits made after our cutoff time will be credited the following business day.

16.  The Access Device at all times remains the property of Financial Institution and upon revocation of the Access Device you agree to surrender the Access Device to Financial Institution or its agent upon demand.

17.  Transactions made in Foreign currency will be converted to U.S. Dollars.  The Exchange rate between the transaction currency and the billing currency used for processing international transactions is: A rate selected by Visa from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate Visa itself receives, or the government mandated rate in effect for the applicable central processing date, in each instance, plus or minus any adjustment determined by the issuer.

18.  Financial Institution may amend, modify or rescind these rules and regulations at any time by mailing or delivering written notice of such amendment, modification or rescission to you at least 21 days prior to the effective date of any such change if the change would result in increased fees or charges, increased liability to you, fewer types of available electronic fund transfers, or stricter limitations on the frequency or dollar amount of transfers.

Financial Institution may at its option mail or deliver written notice to you of any amendment, modification or rescission other than those described above but without the requirement that notice be mailed or delivered at least 21 days prior to the effective date of any such change.

Any amendment, modification or rescission made in the manner described above shall be binding upon you as though expressly agreed to by you.  In the event that a written notice is mailed to you, it shall be mailed to your last known address as shown on Financial Institution's records.

Notwithstanding the provisions of this paragraph, Financial Institution may terminate this agreement at any time in the event that Financial Institution terminates your account(s).

19.  You agree that this Agreement and Disclosure shall be subject to and governed by all applicable state laws and any applicable laws of the United States.

20.  For your safety, please remember the following tips when you use any Automated Teller Machine, particularly after dark:
    (1)  Park in or near a well-lighted area.
    (2)  Observe the area for suspicious persons or activity, preferably from your car, before beginning your transaction.  If you see anyone or anything suspicious, you may wish to use another Automated Teller Machine or delay your transaction.
    (3)  Have someone accompany you.
    (4)  Pocket your cash quickly and count it later in a safe place.  Never make a display of your cash.
    (5)  Cancel your transaction, remove your card and leave the area immediately, even in the middle of a transaction, if you become concerned for your safety.

# EXHIBIT "C"

**Office of the Comptroller of the Currency**
**Board of Governors of the Federal Reserve System**
**Federal Deposit Insurance Corporation**
**National Credit Union Administration**

**Joint Guidance on Overdraft Protection Programs**

**February 18, 2005**

The Office of the Comptroller of the Currency (OCC), Board of Governors of the Federal Reserve System (Board), Federal Deposit Insurance Corporation (FDIC), and National Credit Union Administration (NCUA), collectively "the Agencies," are issuing this joint guidance concerning a service offered by insured depository institutions that is commonly referred to as "bounced-check protection" or "overdraft protection." This credit service is sometimes offered on both consumer and small business transaction accounts as an alternative to traditional ways of covering overdrafts. This joint guidance is intended to assist insured depository institutions in the responsible disclosure and administration of overdraft protection services, particularly those that are marketed to consumers.[1]

**Introduction**

To protect against account overdrafts, some consumers obtain an overdraft line of credit, which is subject to the disclosure requirements of the Truth in Lending Act (TILA). If a consumer does not have an overdraft line of credit, the institution may accommodate the consumer and pay overdrafts on a discretionary, ad-hoc basis. Regardless of whether the overdraft is paid, institutions typically have imposed a fee when an overdraft occurs, often referred to as a nonsufficient funds or "NSF" fee. Over the years, this accommodation has become automated by many institutions. Historically, institutions have not promoted this accommodation. This approach has not raised significant concerns.

More recently, some depository institutions have offered "overdraft protection" programs that, unlike the discretionary accommodation traditionally provided to those lacking a line of credit or other type of overdraft service (e.g., linked accounts), are marketed to

---

[1] Federal credit unions are already subject to certain regulatory requirements governing the establishment and maintenance of overdraft programs. 12 CFR § 701.21(c)(3). This regulation requires a federal credit union offering an overdraft program to adopt a written policy specifying the dollar amount of overdrafts that the credit union will honor (per member and overall); the time limits for a member to either deposit funds or obtain a loan to cover an overdraft; and the amount of the fee and interest rate, if any, that the credit union will charge for honoring overdrafts. This joint guidance supplements but does not change these regulatory requirements for federal credit unions.

consumers essentially as short-term credit facilities. These marketed programs typically provide consumers with an express overdraft "limit" that applies to their accounts.

While the specific details of overdraft protection programs vary from institution to institution, and also vary over time, those currently offered by institutions incorporate some or all of the following characteristics:

- Institutions inform consumers that overdraft protection is a feature of their accounts and promote the use of the service. Institutions also may inform consumers of their aggregate dollar limit under the overdraft protection program.

- Coverage is automatic for consumers who meet the institution's criteria (e.g., account has been open a certain number of days; deposits are made regularly). Typically, the institution performs no credit underwriting.

- Overdrafts generally are paid up to the aggregate limit set by the institution for the specific class of accounts, typically $100 to $500.

- Many program disclosures state that payment of an overdraft is discretionary on the part of the institution, and may disclaim any legal obligation of the institution to pay any overdraft.

- The service may extend to check transactions as well as other transactions, such as withdrawals at automated teller machines (ATMs), transactions using debit cards, pre-authorized automatic debits from a consumer's account, telephone-initiated funds transfers, and on-line banking transactions.[2]

- A flat fee is charged each time the service is triggered and an overdraft item is paid. Commonly, a fee in the same amount would be charged even if the overdraft item was not paid. A daily fee also may apply for each day the account remains overdrawn.

- Some institutions offer closed-end loans to consumers who do not bring their accounts to a positive balance within a specified time period. These repayment plans allow consumers to repay their overdrafts and fees in installments.

## Concerns

Aspects of the marketing, disclosure, and implementation of some overdraft protection programs, intended essentially as short-term credit facilities, are of concern to the Agencies. For example, some institutions have promoted this credit service in a manner that leads consumers to believe that it is a line of credit by informing consumers that their account includes an overdraft protection limit of a specified dollar amount without clearly

---

[2] Transaction accounts at credit unions are called share draft accounts. For purposes of this joint guidance, the use of the term "check" includes share drafts.

disclosing the terms and conditions of the service, including how fees reduce overdraft protection dollar limits, and how the service differs from a line of credit.

In addition, some institutions have adopted marketing practices that appear to encourage consumers to overdraw their accounts, such as by informing consumers that the service may be used to take an advance on their next paycheck, thereby potentially increasing the institutions' credit exposure with little or no analysis of the consumer's creditworthiness. These overdraft protection programs may be promoted in a manner that leads consumers to believe that overdrafts will always be paid when, in reality, the institution reserves the right not to pay some overdrafts. Some institutions may advertise accounts with overdraft protection coverage as "free" accounts, and thereby lead consumers to believe that there are no fees associated with the account or the overdraft protection program.

Furthermore, institutions may not clearly disclose that the program may cover instances when consumers overdraw their accounts by means other than check, such as at ATMs and point-of-sale (POS) terminals. Some institutions may include overdraft protection amounts in the sum that they disclose as the consumer's account "balance" (for example, at an ATM) without clearly distinguishing the funds that are available for withdrawal without overdrawing the account. Where the institution knows that the transaction will trigger an overdraft fee, such as at a proprietary ATM, institutions also may not alert the consumer prior to the completion of the transaction to allow the consumer to cancel the transaction before the fee is triggered.

Institutions should weigh carefully the risks presented by the programs including the credit, legal, reputation, safety and soundness, and other risks. Further, institutions should carefully review their programs to ensure that marketing and other communications concerning the programs do not mislead consumers to believe that the program is a traditional line of credit or that payment of overdrafts is guaranteed, do not mislead consumers about their account balance or the costs and scope of the overdraft protection offered, and do not encourage irresponsible consumer financial behavior that potentially may increase risk to the institution.

**Safety & Soundness Considerations**

When overdrafts are paid, credit is extended. Overdraft protection programs may expose an institution to more credit risk (e.g., higher delinquencies and losses) than overdraft lines of credit and other traditional overdraft protection options to the extent these programs lack individual account underwriting. All overdrafts, whether or not subject to an overdraft protection program, are subject to the safety and soundness considerations contained in this section.

Institutions providing overdraft protection programs should adopt written policies and procedures adequate to address the credit, operational, and other risks associated with these types of programs. Prudent risk management practices include the establishment of express account eligibility standards and well-defined and properly documented dollar limit decision criteria. Institutions also should monitor these accounts on an ongoing

basis and be able to identify consumers who may represent an undue credit risk to the institution. Overdraft protection programs should be administered and adjusted, as needed, to ensure that credit risk remains in line with expectations. This may include, where appropriate, disqualification of a consumer from future overdraft protection. Reports sufficient to enable management to identify, measure, and manage overdraft volume, profitability, and credit performance should be provided to management on a regular basis.

Institutions also are expected to incorporate prudent risk management practices related to account repayment and suspension of overdraft protection services. These include the establishment of specific timeframes for when consumers must pay off their overdraft balances. For example, there should be established procedures for the suspension of overdraft services when the account holder no longer meets the eligibility criteria (such as when the account holder has declared bankruptcy or defaulted on another loan at the bank) as well as for when there is a lack of repayment of an overdraft. In addition, overdraft balances should generally be charged off when considered uncollectible, but no later than 60 days from the date first overdrawn.[3] In some cases, an institution may allow a consumer to cover an overdraft through an extended repayment plan when the consumer is unable to bring the account to a positive balance within the required time frames. The existence of the repayment plan, however, would not extend the charge-off determination period beyond 60 days (or shorter period if applicable) as measured from the date of the overdraft. Any payments received after the account is charged off (up to the amount charged off against allowance) should be reported as a recovery.
Some overdrafts are rewritten as loan obligations in accordance with an institution's loan policy and supported by a documented assessment of that consumer's ability to repay. In those instances, the charge-off timeframes described in the Federal Financial Institutions Examination Council (FFIEC) Uniform Retail Credit Classification and Account Management Policy would apply.[4]

With respect to the reporting of income and loss recognition on overdraft protection programs, institutions should follow generally accepted accounting principles (GAAP) and the instructions for the Reports of Condition and Income (Call Report), and NCUA 5300 Call Report. Overdraft balances should be reported on regulatory reports as loans. Accordingly, overdraft losses should be charged off against the allowance for loan and lease losses. The Agencies expect all institutions to adopt rigorous loss estimation processes to ensure that overdraft fee income is accurately measured. Such methods may include providing loss allowances for uncollectible fees or, alternatively, only recognizing that portion of earned fees estimated to be collectible.[5] The procedures for estimating an adequate allowance should be documented in accordance with the Policy

---

[3] Federal credit unions are required by regulation to establish a time limit, not to exceed 45 calendar days, for a member to either deposit funds or obtain an approved loan from the credit union to cover each overdraft. 12 CFR § 701.21(c)(3).
[4] For federally insured credit unions, charge-off policy for booked loans is described in NCUA Letter to Credit Unions No. 03-CU-01, "Loan Charge-off Guidance," dated January 2003.
[5] Institutions may charge off uncollected overdraft fees against the allowance for loan and lease losses if such fees are recorded with overdraft balances as loans and estimated credit losses on the fees are provided for in the allowance for loan and lease losses.

4

Statement on the Allowance for Loan and Lease Losses Methodologies and Documentation for Banks and Savings Institutions.[6]

If an institution advises account holders of the available amount of overdraft protection, for example, when accounts are opened or on depositors' account statements or ATM receipts, the institution should report the available amount of overdraft protection with legally binding commitments for Call Report, and NCUA 5300 Call Report purposes. These available amounts, therefore, should be reported as "unused commitments" in regulatory reports.

The Agencies also expect proper risk-based capital treatment of outstanding overdrawn balances and unused commitments.[7] Overdraft balances should be risk-weighted according to the obligor. Under the federal banking agencies' risk-based capital guidelines, the capital charge on the unused portion of commitments generally is based on an off-balance sheet credit conversion factor and the risk weight appropriate to the obligor. In general, these guidelines provide that the unused portion of a commitment is subject to a zero percent credit conversion factor if the commitment has an original maturity of one year or less, or a 50 percent credit conversion factor if the commitment has an original maturity over one year. Under these guidelines, a zero percent conversion factor also applies to the unused portion of a "retail credit card line" or "related plan" if it is unconditionally cancelable by the institution in accordance with applicable law.[8] The phrase "related plans" in these guidelines includes overdraft checking plans. The Agencies believe that the overdraft protection programs discussed in this joint guidance fall within the meaning of "related plans" as a type of "overdraft checking plan" for the purposes of the federal banking agencies' risk-based capital guidelines. Consequently, overdraft protection programs that are unconditionally cancelable by the institution in accordance with applicable law would qualify for a zero percent credit conversion factor.

Institutions entering into overdraft protection contracts with third-party vendors must conduct thorough due diligence reviews prior to signing a contract. The interagency guidance contained in the November 2000 Risk Management of Outsourced Technology Services outlines the Agencies' expectations for prudent practices in this area.

**Legal Risks**

Overdraft protection programs must comply with all applicable federal laws and regulations, some of which are outlined below. State laws also may be applicable, including usury and criminal laws, and laws on unfair or deceptive acts or practices. It is important that institutions have their overdraft protection programs reviewed by counsel

---

[6] Issued by the Board, FDIC, OCC, and Office of Thrift Supervision. The NCUA provided similar guidance to credit unions in Interpretive Ruling and Policy Statement 02-3, "Allowance for Loan and Lease Losses Methodologies and Documentation for Federally Insured Credit Unions," 67 FR 37445, May 29, 2002.
[7] Federally insured credit unions should calculate risk-based net worth in accordance with the rules contained in 12 CFR Part 702.
[8] See 12 CFR Part 3, Appendix A, Section 3 (b)(5) (OCC); 12 CFR Part 208, Appendix A, Section III.D.5 (Board); and 12 CFR Part 325, Appendix A, Section II.D.5 (FDIC).

for compliance with all applicable laws prior to implementation.  Further, although the guidance below outlines federal laws and regulations as of the date this joint guidance is published, applicable laws and regulations are subject to amendment.  Accordingly, institutions should monitor applicable laws and regulations for revisions and to ensure that their overdraft protection programs are fully compliant.

<u>Federal Trade Commission Act / Advertising Rules</u>
Section 5 of the Federal Trade Commission Act (FTC Act) prohibits unfair or deceptive acts or practices.[9]  The banking agencies enforce this section pursuant to their authority in section 8 of the Federal Deposit Insurance Act, 12 U.S.C. § 1818.[10]  An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.  An act or practice is deceptive if, in general, it is a representation, omission, or practice that is likely to mislead a consumer acting reasonably under the circumstances, and the representation, omission, or practice is material.

In addition, the NCUA has promulgated similar rules that prohibit federally insured credit unions from using advertisements or other representations that are inaccurate or misrepresent the services or contracts offered.[11]  These regulations are broad enough to prohibit federally insured credit unions from making any false representations to the public regarding their deposit accounts.

Overdraft protection programs may raise issues under either the FTC Act or, in connection with federally insured credit unions, the NCUA's advertising rules, depending upon how the programs are marketed and implemented.  To avoid engaging in deceptive, inaccurate, misrepresentative, or unfair practices, institutions should closely review all aspects of their overdraft protection programs, especially any materials that inform consumers about the programs.

<u>Truth in Lending Act</u>
TILA and Regulation Z require creditors to give cost disclosures for extensions of consumer credit.[12]  TILA and the regulation apply to creditors that regularly extend consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments.[13]

Under Regulation Z, fees for paying overdraft items currently are not considered finance charges if the institution has not agreed in writing to pay overdrafts.[14]  Even where the

---

[9] 15 U.S.C. § 45.
[10] See OCC Advisory Letter 2002-3 (March 2002); and joint Board and FDIC Guidance on Unfair or Deceptive Acts or Practices by State-Chartered Banks (March 11, 2004).
[11] 12 CFR § 740.2.
[12] 15 U.S.C. §§ 1601 et seq.  TILA is implemented by Regulation Z, 12 CFR Part 226.
[13] See 15 U.S.C. § 1602(f) and 12 CFR 226.2(a)(17).  Institutions should be aware that whether a written agreement exists is a matter of state law.  See, e.g., 12 CFR § 226.5.
[14] See 12 CFR 226.4(c)(3).  Traditional lines of credit, which generally are subject to a written agreement, do not fall under this exception.

institution agrees in writing to pay overdrafts as part of the deposit account agreement, fees assessed against a transaction account for overdraft protection services are finance charges only to the extent the fees exceed the charges imposed for paying or returning overdrafts on a similar transaction account that does not have overdraft protection.

Some financial institutions also offer overdraft repayment loans to consumers who are unable to repay their overdrafts and bring their accounts to a positive balance within a specified time period.[15]  These closed-end loans will trigger Regulation Z disclosures, for example, if the loan is payable by written agreement in more than four installments. Regulation Z will also be triggered where such closed-end loans are subject to a finance charge.[16]

Equal Credit Opportunity Act
Under the Equal Credit Opportunity Act (ECOA) and Regulation B, creditors are prohibited from discriminating against an applicant on a prohibited basis in any aspect of a credit transaction.[17]  This prohibition applies to overdraft protection programs.  Thus, steering or targeting certain consumers on a prohibited basis for overdraft protection programs while offering other consumers overdraft lines of credit or other more favorable credit products or overdraft services, will raise concerns under the ECOA.

In addition to the general prohibition against discrimination, the ECOA and Regulation B contain specific rules concerning procedures and notices for credit denials and other adverse action. Regulation B defines the term "adverse action," and generally requires a creditor who takes adverse action to send a notice to the consumer providing, among other things, the reasons for the adverse action.[18]  Some actions taken by creditors under overdraft protection programs might constitute adverse action but would not require notice to the consumer if the credit is deemed to be "incidental credit" as defined in Regulation B.  "Incidental credit" includes consumer credit that is not subject to a finance charge, is not payable by agreement in more than four installments, and is not made pursuant to the terms of a credit card account.[19]  Overdraft protection programs that are not covered by TILA would generally qualify as incidental credit under Regulation B.


Truth in Savings Act
Under the Truth in Savings Act (TISA), deposit account disclosures must include the amount of any fee that may be imposed in connection with the account and the conditions

---

[15] For federal credit unions, this time period may not exceed 45 calendar days.  12 CFR § 701.21(c)(3).
[16] See 12 CFR 226.4.
[17] 15 U.S.C. §§ 1691 et seq.  The ECOA is implemented by Regulation B, 12 CFR Part 202.  The ECOA prohibits discrimination on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to contract), the fact that all or part of the applicant's income derives from a public assistance program, and the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act.
[18] See 12 CFR §§ 202.2(c) and 9.
[19] See 12 CFR § 202.3(c).

under which the fee may be imposed.[20]   In addition, institutions must give advance notice to affected consumers of any change in a term that was required to be disclosed if the change may reduce the annual percentage yield or adversely affect the consumer.

When overdraft protection services are added to an existing deposit account, advance notice to the account holder may be required, for example, if the fee for the service exceeds the fee for accounts that do not have the service.[21]   In addition, TISA prohibits institutions from making any advertisement, announcement, or solicitation relating to a deposit account that is inaccurate or misleading or that misrepresents their deposit contracts.

Since these automated and marketed overdraft protection programs did not exist when most of the implementing regulations were issued, the regulations may be reevaluated.

Electronic Fund Transfer Act
The Electronic Fund Transfer Act (EFTA) and Regulation E require an institution to provide consumers with account-opening disclosures and to send a periodic statement for each monthly cycle in which an electronic fund transfer (EFT) has occurred and at least quarterly if no transfer has occurred.[22]   If, under an overdraft protection program, a consumer could overdraw an account by means of an ATM withdrawal or POS debit card transaction, both are EFTs subject to EFTA and Regulation E.  As such, periodic statements must be readily understandable and accurate regarding debits made, current balances, and fees charged.  Terminal receipts also must be readily understandable and accurate regarding the amount of the transfer.  Moreover, readily understandable and accurate statements and receipts will help reduce the number of alleged errors that the institution must investigate under Regulation E, which can be time-consuming and costly to institutions.

**Best Practices**

Clear disclosures and explanations to consumers of the operation, costs, and limitations of an overdraft protection program and appropriate management oversight of the program are fundamental to enabling responsible use of overdraft protection.  Such disclosures and oversight can also minimize potential consumer confusion and complaints, foster good customer relations, and reduce credit, legal, and other potential risks to the institution.  Institutions that establish overdraft protection programs should, as applicable, take into consideration the following best practices, many of which have been recommended or implemented by financial institutions and others, as well as practices that may otherwise be required by applicable law.  While the Agencies are concerned about promoted overdraft protection programs, the best practices may also be useful for

---

[20] 12 U.S.C. §§ 4301 et seq.  TISA is implemented by Regulation DD at 12 CFR Part 230 for banks and savings associations, and by NCUA's TISA regulation at 12 CFR Part 707 for federally insured credit unions.
[21] An advance change in terms notice would not be required if the consumer's account disclosures stated that their overdraft check may or may not be paid and the same fee would apply.
[22] 15 U.S.C. §§ 1693 et seq.  The EFTA is implemented by Regulation E, 12 CFR Part 205.

other methods of covering overdrafts. These best practices currently observed in or recommended by the industry include:

<u>Marketing and Communications with Consumers</u>

- **Avoid promoting poor account management.** Institutions should not market the program in a manner that encourages routine or intentional overdrafts. Institutions should instead present the program as a customer service that may cover inadvertent consumer overdrafts.

- **Fairly represent overdraft protection programs and alternatives.** When informing consumers about an overdraft protection program, inform consumers generally of other overdraft services and credit products, if any, that are available at the institution and how the terms, including fees, for these services and products differ. Identify for consumers the consequences of extensively using the overdraft protection program.

- **Train staff to explain program features and other choices.** Train customer service or consumer complaint processing staff to explain their overdraft protection program's features, costs, and terms, including how to opt out of the service. Staff also should be able to explain other available overdraft products offered by the institution and how consumers may qualify for them.

- **Clearly explain discretionary nature of program.** If payment of an overdraft is discretionary, make this clear. Institutions should not represent that the payment of overdrafts is guaranteed or assured if the institution retains discretion not to pay an overdraft.

- **Distinguish overdraft protection services from "free" account features.** Institutions should not promote "free" accounts and overdraft protection programs in the same advertisement in a manner that suggests the overdraft protection program is free of charges.

- **Clearly disclose program fees.** In communications about overdraft protection programs, clearly disclose the dollar amount of the fee for each overdraft and any interest rate or other fees that may apply. For example, rather than merely stating that the institution's standard NSF fee will apply, institutions should restate the dollar amount of any applicable fee or interest charge.

- **Clarify that fees count against the disclosed overdraft protection dollar limit.** Consumers should be alerted that the fees charged for covering overdrafts, as well as the amount of the overdraft item, will be subtracted from any overdraft protection limit disclosed.

- **Demonstrate when multiple fees will be charged.** If promoting an overdraft protection program, clearly disclose, where applicable, that more than one overdraft

9

fee may be charged against the account per day, depending on the number of checks presented on, and other withdrawals made from, the consumer's account.

- **Explain impact of transaction clearing policies.** Clearly explain to consumers that transactions may not be processed in the order in which they occurred, and that the order in which transactions are received by the institution and processed can affect the total amount of overdraft fees incurred by the consumer.

- **Illustrate the type of transactions covered.** Clearly disclose that overdraft fees may be imposed on transactions such as ATM withdrawals, debit card transactions, preauthorized automatic debits, telephone-initiated transfers or other electronic transfers, if applicable, to avoid implying that check transactions are the only transactions covered.

Program Features and Operation

- **Provide election or opt-out of service.** Obtain affirmative consent of consumers to receive overdraft protection. Alternatively, where overdraft protection is automatically provided, permit consumers to "opt out" of the overdraft program and provide a clear consumer disclosure of this option.

- **Alert consumers before a transaction triggers any fees.** When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees (for example, it presently may be feasible at a branch teller window). This notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice. If this is not feasible, then post notices (e.g., on proprietary ATMs) explaining that transactions may be approved that overdraw the account and fees may be incurred. Institutions should consider making access to the overdraft protection program unavailable through means other than check transactions, if feasible.

- **Prominently distinguish balances from overdraft protection funds availability.** When disclosing a single balance for an account by any means, institutions should not include overdraft protection funds in that account balance. The disclosure should instead represent the consumer's own funds available without the overdraft protection funds included. If more than one balance is provided, separately (and prominently) identify the balance without the inclusion of overdraft protection.

- **Promptly notify consumers of overdraft protection program usage each time used.** Promptly notify consumers when overdraft protection has been accessed, for example, by sending a notice to consumers the day the overdraft protection program has been accessed. The notification should identify the date of the transaction, the type of transaction, the overdraft amount, the fee associated with the overdraft, the amount necessary to return the account to a positive balance, the amount of time consumers have to return their accounts to a positive balance, and the consequences

of not returning the account to a positive balance within the given timeframe. Notify consumers if the institution terminates or suspends the consumer's access to the service, for example, if the consumer is no longer in good standing.

- **Consider daily limits on the consumer's costs.** Consider imposing a cap on consumers' potential daily costs from the overdraft program. For example, consider limiting daily costs from the program by providing a numerical limit on the total overdraft transactions that will be subject to a fee per day or by providing a dollar limit on the total fees that will be imposed per day.

- **Monitor overdraft protection program usage.** Monitor excessive consumer usage, which may indicate a need for alternative credit arrangements or other services, and inform consumers of these available options.

- **Fairly report program usage.** Institutions should not report negative information to consumer reporting agencies when the overdrafts are paid under the terms of overdraft protection programs that have been promoted by the institutions.

This concludes the text of the final Joint Guidance on Overdraft Protection Programs.

# EXHIBIT "D"



# Overdraft Protection
## A Guide for Bankers

Overdraft Protection  A Guide for Bankers

## Table of Contents

A Guide for Bankers                                                          7

How Formalized Overdraft Protection Programs Work                          10

Why Are More Bankers Considering Formalized Overdraft Protection?          12

Common Concerns                                                            13

Addressing the Regulatory Concerns                                         16

Recommended Best Practice "Do's and Don'ts"                                18

Concluding Remarks                                                         21

Appendix                                                                   23

# OVERDRAFT PROTECTION
# A GUIDE FOR BANKERS

Opinions abound about overdraft services – those formalized systems handling Non Sufficient Funds (NSFs) presented on a customer's account. Nessa Feddis, Senior Federal Counsel of the ABA, offers her insights in a recent article stating "the basics of bounce protection are sound."[1]  At the same time, the Consumer Federation of America asserts that financial organizations are deliberately enticing consumers to write bad checks.[2]  Vendors of overdraft programs extol their "customer-oriented" virtues, while the news media present overdraft users as pictures of despair.  CEOs of some financial organizations tout the benefits to their customers, while others disparage the practice.  Some banking organizations sign deals with vendors to endorse the programs, while a few publish negative opinions about them.

With this wide range of opinions, it is no wonder that many, inside the industry and out, question the practice and/or the methods of overdraft services.  As a financial executive, how are you to approach overdraft services in order to best serve your customers, shareholders, and the public welfare?

Offering an overdraft protection program is a decision unique to each executive and organization.  However, sometimes lost in the heat of the debate is the clarity created from a common set of facts.  Concerns and fears grow in the absence of facts.  Legitimate questions exist about overdraft services, and they deserve an analytical answer.  Why has the overdraft issue arisen so fervently now and not 20 years ago?  What are the benefits or reasons for a formalized overdraft program at your financial institution?  What are the regulatory compliance components?  What are recommended best practices, and what practices should be more cautiously considered or even avoided?  Furthermore, concerns of the media and consumer groups alike have made it clear that there are definitely potential risks associated with overdraft programs, in the event the bank makes a mistake or "over-reaches" in the implementation.

Before making a decision, each bank should review any program being considered with a critical eye towards what is "right" for the customer and the bank. We hope that this guide will equip you with the background and knowledge you need to make the right decision for your bank.

[1] Nessa Eileen Feddis, "Will We Kill a Useful Service?" ABA Banking Journal, April 2003, 42.
[2] Consumer Federation of America and National Consumer Law Center, "Bounce Protection: How Banks Turn Rubber into Gold by Enticing Consumers to Write Bad Checks," 27 Jan. 2003, <http://www.consumerfed.org/bounceappendix012803.pdf> (17 September 2003), Section 5.

### The Origins of the "Late Payment" Choice

Overall, consumer perceptions about debt and late payments are changing.  A few years ago, some consumers counted on "float" to carry them through times when they might have been low on funds between paychecks. Over the past few years, float has been considerably decreased due to improved automation of processing systems, the increased usage of Internet banking, and the requirements of the Expedited Funds Availability Act.  The increased time to clear a check that so many counted on before is no longer there.

Currently, on most of the bills that consumers pay on a monthly basis, the recipient is given the opportunity to pay the bill on time for one amount and late for a different (higher) amount.  Consumers who choose to utilize the late payment option are aware of the late fee they will pay for this service.  While one could certainly argue that this is financially imprudent, it is a choice that many make on a monthly basis.

Utility companies such as phone, gas, water, cable, and electric providers made this adjustment towards late payments in their policies in the 1990s.  Prior to their change in approach, these industries often faced customer and public policy embarrassments when they discontinued service due to lack of payment.  In order to meet customers' payment needs, they changed their approach, finding ways to serve customers who happened to be strapped for cash between paychecks.  Below is a sample disclosure statement from a utility company that allows customers to pay their bills at a later date for an additional charge.

---

**Sample Water Utility Policy Statement**

**Payments:**
Utility payments are due by the 15th of the month.
Utility payments can be deposited in the drop slot located in the door of the City Office.

**Late Payments:**
Payments received after the 15th of the month are considered late.
A late charge of $25.00 will be added to any bill not paid by the 15th.

**Disconnect:**
Utilities will be disconnected if payment is not received by the last day of the month.

**Reconnect fee is $25.00.**

---

To address customer needs, vendors today supply what is now well recognized by consumers: an invoice, similar to the one above, which offers one payment if paid by a certain date, and a higher amount if paid by a later date. In defining why customers paid late fees, one utility study found that a significant segment did so even though they have sufficient financial resources.[3]

Bankers may want to consider the way they communicate with their customers regarding overdrawn accounts.  Compare the sample utility bill referenced above with the method financial institutions commonly use to communicate with their customers.  Non-bank companies typically inform the consumer of their methods of handling their account in the event the consumer does not meet their obligations on time, and they communicate the fee associated with this.  They do not actively entice customers to pay their bills late, but they communicate how the account will be handled should the consumer pay late.  Contrast this with the communication sent out by the bank.  When an item is presented to an account with insufficient funds to pay the check, the bank generally sends out a terse notice indicating that the customer did not have the funds in their account to cover the check.  The communication usually indicates that, although the bank may have paid the check, the practice of falling below the minimum balance in the account is not something the bank encourages.

## The New Dynamics of Checking Accounts and Customer Communication

As new payment options have flourished over the past several years, the methods and means in which consumers use checking accounts have also changed.  Rather than having only checks flow through their checking account, consumers now have many ways to access their funds, such as Internet access, ATM access, etc.

A by-product of having multiple delivery channels is that consumers now need better, more specific communication from financial institutions regarding use of these accounts.  Financial institutions should be aware that in regard to consumers' attitudes toward late payments, the environment is changing.  Banks need to be able to clearly articulate polices so that consumers can make

[3] Roger D. Colton, "Determining the Cost Effectiveness of Utility Late Payment Charges," July 1994, http://www.fsconline.com/downloads/LATE-FEE.pdf (17 September 2003).

informed decisions as well as understand the bank's policy regarding NSF fees when a customer mistakenly overdraws.

### The Dilemma

Many bankers believe that a response that discourages overdrafts is the accepted course of action. They believe that overdrafting a checking account is simply "wrong." They believe that banks should actively discourage overdrafts and they view NSF fees as "punitive" fees that are designed to discourage the activity.

Other bankers believe that most of their customers are good customers that will ultimately clear up their accounts, and that paying an insufficient item is better for the customer than returning it. While not encouraging overdrafts, these bankers believe that they are actually helping their customers avoid other fees and providing them a valuable service when they pay overdrawn items.

**Which view is appropriate?  Or more precisely, which view is appropriate for your bank?**

In many cases, these two views are not mutually exclusive. Bankers do not want to actively encourage overdrafts, but they do want to provide good customer service whenever and wherever prudent.

## HOW FORMALIZED OVERDRAFT PROTECTION PROGRAMS WORK

The first question you might ask is, "How do these programs work?" An example may help illustrate the programs' underlying concepts.

*John Smith is a customer at ABC Bank. John sits down to pay his bills on the 9th of the month. He gets to his credit card bill and he notices that the payment is due on the 15th, or he can wait and pay it on the 1st of the following month, in which case he will be charged a $36 late fee. He decides to wait and pay the credit card bill late because he has an unexpected emergency expense that he needs to pay immediately. John understands "the deal" with the credit card company – they have communicated this to him with every bill. John*

*understands that he will incur the late fee, but in spite of this, he makes the decision to defer the payment.*

*John isn't sure how ABC Bank would generally handle it if he were to present an NSF check. In the past he has presented checks that were paid when funds were not available, but he has also presented some that were returned. The bank's communication in both cases was very short and did not inform John how they made their decision. As a result, John has no comfort at all as to how the bank might handle the next check he presents.*

*ABC Bank decides to begin offering a formal overdraft program. Through a variety of techniques, the bank communicates clearly with John and generally makes him aware of their decision-making process. When John is next faced with making the decision of whether or not to pay the credit card bill, he now considers his options. He can continue to pay the bill late as he has on occasion in the past, or he can go ahead and write the check to the credit card company today and have some comfort that the bank will probably pay it. He would pay the bank $20 (their NSF fee) vs. paying the credit card company $36.*

## The Informed Consumer Effect

By communicating with customers, banks that offer formalized overdraft protection programs achieve the "Informed Consumer Effect," helping participants to make an informed decision on how to utilize this service, should the need arise. Because John is given some comfort on how his check will be handled, he shifts a fee from the credit card company to the bank and pays less in fees.

Just how does a bank communicate with a customer? This is an area where bankers should proceed with caution. A non-recommended method of communicating with customers is to market the service aggressively. A few banks put up billboards, take out radio ads, and do regular monthly statement stuffers. But as the Office of the Comptroller of the Currency pointed out in Interpretive Letter 914 (IL914), this could have the appearance that the bank is attempting to entice customers to overdraw their accounts, an activity that at best is "frowned upon" by consumer groups, and at worst could be considered an unsafe practice. At a typical bank, 60% to 70% of the customer base never (or rarely) present an insufficient item, and marketing to them is wasteful.

However, an efficient, fair, and consistent process could also be considered an opportunity for clear communication to customers -- a way to enhance a customer relationship. Customers are often confused by the NSF decision-making process in those banks that do not have a formalized program, since there is often inconsistency in payment of NSF items. Banks that offer a formalized overdraft program have the opportunity to establish consistent guidelines for paying NSF items and to inform and educate customers who use the service.

## WHY ARE MORE BANKERS CONSIDERING FORMALIZED OVERDRAFT PROTECTION?

As of January 2003, the Consumer Federation of America estimated that more than 1,000 banks in the United States use formalized overdraft protection programs, and that number is steadily growing.[4] Why are more bankers considering these programs?

### 1. A New Definition of Customer Service

One of the most common complaints by consumer groups about overdraft protection services is that banks with these programs are providing "bad" customer service. Some consumer groups equate the paying of overdrafts with "payday" lending. They believe that paying an overdraft item is equivalent to taking advantage of an uninformed customer.

However, this seems to be an oversimplification of a much broader issue. Think about it from the perspective of your customers -- would they consider it better customer service if the bank paid their check or returned it?

Bank employees also benefit from a consistent overdraft program that offers them guidance on how and when to cover overdraft items. Since they can now define their overdraft policy and explain it to the customer, they can offer better customer service. Defined overdraft program guidelines eliminate banker and customer confusion and lead to improved customer service.

### 2. A Way to Avoid Discriminatory Practices

Organized overdraft protection programs formalize a process that has been han-

---

[4] Consumer Federation of America, "Bounce Protection," Section 2.

died informally and in a discretionary manner in the past, making it more equitable and consistent. In general, banks have historically paid items for some customers and not paid them for others, based mostly on a variety of factors, including account history and the relationships the customer has with the personal bankers or CSRs working in the branch.  By using overdraft protection software and more efficient automation, the banks that implement these programs state that they are attempting to treat all customers more fairly.

### 3.  Increased Opportunity

When banks formalize their programs and disclose them, they learn that some customers find this to be a valuable service.  These customers choose to write a check a few days before a deposit and pay the NSF fee rather than pay a late fee to the check recipient.  They choose the bank option because the costs are generally lower than those imposed by the merchant or other payee, and it presents less of a hassle.  Financial institutions that formalize their process and disclose it to customers allow their customers to make informed decisions for themselves.

## COMMON CONCERNS

Bankers need to address a number of concerns before they decide to implement such a formal overdraft program.  Questions raised by the media and consumers groups alike have spawned a variety of concerns.

### Perceptions of "Abusing" the Customer

Media and consumer groups have voiced concerns that some overdraft protection programs are by nature deceptive and designed to take advantage of consumers.  Other media reports discuss cases in which banks have allowed customers to overdraw with their ATM or debit card, at either the ATM or the point of sale, without notification that they were overdrawing the account or that they would be charged a fee.  (Reg DD requires fee disclosure at account opening and on periodic statements.)

It is interesting to note that in most overdraft discussions the media and consumer groups often gloss over individual consumer responsibility.  Banks only charge these fees to consumers that present NSF items.  Overdrawing is a dis-

cretionary activity and is completely avoidable, much like the decision to use a foreign ATM. In both cases, the service provided is merely responding to customer need and behavior.

Although the ultimate responsibility lies with the consumer, situations may arise in which a customer becomes overextended and is unable to pay back the overdrawn amount and subsequent fees. As customer service organizations, banks should be aware of these situations and work with the customer to resolve the issue. Any program allowing chronic overdrafts that put the customer in difficult financial circumstances may seem to take advantage of a customer and, of course, should be avoided. Banks should communicate clearly and frequently with their customers regarding the status of their account balance. The bank may then offer the overextended customer a repayment plan, perhaps at a low interest rate, or reduced NSF fees to help the customer recover from the situation. The checking account could be left open and available, as long as the customer meets their repayment obligations.

## Appearance of Violating Credit Laws

One recent article charged that banks are "skirting" credit laws when they pay overdrafts. The reasoning applied was that an overdraft is a short-term loan and the NSF fee imposed is interest. Some consumer advocates have stated that overdrafts amount to loans with very high interest rates, sometimes exceeding 1,000%.

These allegations ignore the fact that many banks charge the same fee whether the item is paid or returned, and there is no differential for overdrawing the account. More specifically, at most banks customers do not pay any additional fee for overdrawing their accounts – they are only charged a fee for presenting an insufficient item and the bank subsequently handling the item.

Credit laws apply when a bank extends credit to a consumer. According to the Truth in Lending Act, 15 USC 1601 et seq. (TILA) and its implementing Federal Reserve Regulation Z, 12 CFR Part 226, "Credit means the right to defer payment of a debt or to incur debt and defer its payment." The bank does not grant a "right" to overdraw; it is a discretionary activity on the part of

the bank.  Credit laws have not applied to bank overdraft fees in the past, and it is unlikely that they will in the future.

As stated in the American Bankers Association letter from ABA Chairman-Elect Ken Fergeson, dated March 21, 2003, "Overdraft protection has been around for a long time, but has evolved over the years.  Under automated bounce protection systems that are now gaining in popularity, banks disclose that they may pay overdrafts up to a limit—usually between $100 and $500, depending on the customer.  The feature is typically available to all those eligible to open an account.  There is no creditworthiness test as there is for an overdraft line of credit.  A flat fee is charged for the overdraft, regardless of the amount."

Several bankers have shown hesitancy toward overdraft protection programs because of potential changes to Regulation Z (Truth in Lending), which would cause an overdraft to be considered a loan and related charges to be interest for APR purposes.  For decades, under the terms of Regulation Z, regulators have not generally considered overdraft fees to be a loan when the item is paid.  Prior history with other regulations has shown that the Federal Reserve changes them only after careful consideration.

Moreover, any change in regulation would likely impact the payment of all NSF items, not just those items at banks with formal overdraft programs.  It would be a very detrimental change to consumers for the regulators to alter regulations in such a manner that banks could effectively no longer pay any overdrafts.

### Incurring Too Much Risk

It may appear upon initial review that paying overdrafts would increase the overall risk levels of a bank.  After all, the customer is typically not required to complete any type of application for the service.  Most banks do not subject customers to a formal underwriting process prior to allowing the customer to overdraw their account.  The bank typically does not obtain credit scores.

Prudent bankers must approach an overdraft program as they would any other new product or service offering. Analysis of the particular program must be performed with the bank's overall risk tolerance in mind. Acceptable levels of risk must be determined prior to entering any program and monitored after implementation.

Most bankers who have implemented a formal overdraft program indicate that charge-offs do, in fact, increase. However, they also indicate that the overall level of charge-offs is within acceptable levels of risk and the benefits of the overdraft program outweigh the increase in charge-offs.

## ADDRESSING THE REGULATORY CONCERNS

Regulators have expressed concerns when reviewing overdraft protection programs, and all bankers considering this service should take care to address them. Some of the main issues are delineated in OCC Interpretive Letter 914 and further defined in the ABA letter dated March 21, 2003, from Ken Fergeson, ABA Chairman-Elect. IL914 outlines three types of regulatory concerns with respect to one particular overdraft protection program. They include: 1) Compliance Issues, 2) Supervisory Concerns, and 3) Policy Issues. We recommend studying IL914 in depth and reviewing the concerns of the OCC with legal counsel. However, there are basic steps bankers can take to be proactive in addressing these regulatory concerns.

### Define the Process Specifically.

For many years banks have paid checks on an inconsistent basis, often times lacking universal guidelines that employees could follow. Often, banks did not have a formal policy in place to guide bankers on how and when to cover an overdraft. Defining the process specifically will help to alleviate compliance concerns. Due to simple human nature, when paying or returning an overdraft using only personal discretion as a guide, inconsistencies will result. By applying consistent criteria across the board, the entire process should become consistently implemented with all customers.

Overdraft Protection  A Guide for Bankers

**Use Detailed Reporting and Tracking.**
As part of the bank's formal process, the bank should use detailed reporting and tracking of accounts in the overdraft protection program. This will ensure that all levels of management remain apprised of the program, and that potential abusers of the service can be spotted and addressed appropriately, including being removed from the program.

**Avoid Statements that Seem Like Commitments.**
In all written communication to customers, be certain to stay away from statements that sound like absolute commitments to pay overdrafts (e.g., "never incur a merchant charge again"). The Office of the Comptroller of the Currency in its Interpretive Letter 914 (IL914) points out that the Federal Trade Commission Act prohibits deceptive acts or practices, including representations or omissions that are likely to mislead reasonable consumers. Carefully word all the bank's customer communications to explain the overdraft process clearly and directly. Be sure to acknowledge that the process to pay NSFs is completely discretionary and that all overdrafts will not be paid automatically.

**Avoid "Enticing" Customers to Begin Presenting NSFs.**
Studies have shown that most customers do not overdraw their accounts, nor do they want to. In 2002, Raddon Financial Group estimated that nearly 60% of customers have little or no interest in NSF services. Heavy marketing of an overdraft protection program could give the appearance that the bank is attempting to entice customers who currently do not overdraw accounts to begin overdrawing them. Aggressive marketing can potentially backfire, even though the intent may simply be to inform the customer of a helpful, new service that is now available. Instead, establish sound, customer-service response-oriented policies for customers who overdraw their accounts. Above all, do not state that overdrawing is an acceptable practice; offer alternatives. The bank should also provide appropriate disclosures at the ATM and teller window if customers are allowed to overdraw their accounts at those channels.

**Use the Same Fee for Both Paying and Returning.**
One of the "tests" offered in IL914 for determining if an overdraft fee is a finance charge or not, as stated under Regulation Z, is whether an NSF fee is the same regardless of whether a check is paid or returned. By charging the same fee in both instances, the fee is unlikely to be considered a "finance charge."

**Utilize Effective Risk Management Techniques.**
Banks that monitor customer behavior can contact those customers who exhibit excessive or abusive usage and inform them of bank programs that can help them manage their account balances. This practice should identify customers who show a serious lack of account management so that bank management can make decisions on the customer's continued involvement in the bank's overdraft program.

## RECOMMENDED BEST PRACTICE "DO'S AND DON'TS"

In addition to taking proactive steps to address regulatory concerns, adhering to certain "best practices" will help ensure that an overdraft protection program takes the right approach. The main best practices that all bankers should know include:

### Best Practice "Do's"

1. Do inform customers that the bank has other ways to handle overdrafts, such as lines of credit and automatic transfers. Clear communication will give customers all the information they need to make an informed decision. Let your customers know that the bank has other, potentially less expensive ways to handle overdrafts.

2. Do proactively offer an "opt-out" giving the customers a choice. Some customers may not want to have their items paid, and they should be given this choice. By sending each qualified customer a letter with an opt-out clause *before the program is implemented*, bankers are ensuring that all customers are duly informed and are aware of their alternatives.

3. Do monitor customer activity, and don't let customers abuse the service. Utilize software tools to generate detailed reports that will allow the bank to track customers who may be abusing the privilege. Consider contacting and notifying frequent overdrafters of the cost of these services, and suggest a meeting with bank officers to consider other alternatives to overdrafting.

*Overdraft Protection   A Guide for Bankers*

**4. Do apply good risk management techniques, using software to monitor usage.** IL914 notes that overdraft protection programs could increase a bank's credit risk profile (e.g., higher delinquency and loss rates) by extending credit to borrowers who may not have normally qualified for payment of overdrafts or overdraft protection. By utilizing software tools with robust reporting capabilities, you should be able to minimize this risk and manage it accordingly.

**5. Do communicate with customers often, using multiple channels (i.e., letters, phone calls, email).** It is imperative that bankers notify customers as overdrafts are presented and then continue to communicate with the customer while they are overdrawn. As ABA Senior Federal Counsel Nessa Feddis states in an April 2003 *ABA Banking Journal* article, "A consumer understanding of bank practices in this matter is *absolutely critical* to avoid charges of unfair play."[1] Communication and education of customers will help to dispel the mystery of the process and enhance the overall customer relationship as well.

**Best Practice "Don'ts"**

**1. Don't use aggressive marketing.** One of the biggest red flags for regulators and consumer groups alike is a program that tries to achieve increased revenue through aggressive marketing techniques. This kind of customer communication also makes it seem as if the bank is attempting to encourage customers who have not presented NSFs to begin presenting them.

**2. Don't step over the line from a compliance perspective.** Regulators may question programs that give the wrong impression about the scope of protection offered by the program and in turn oversell its benefits. When communicating with customers, it is important to use clear, precise, and accurate language that does not attempt to oversell the customer. Keep in mind that this service is discretionary, and therefore avoid promises or words that sound like commitments to customers. Claims of "no more charges from retailers for insufficient checks," "make a mistake – you're covered," and "write a check or use an ATM for more than you have in the bank – you're covered" are overly broad statements, given the limitations of these programs.

---

[1] Feddis, 40.

**3. Don't allow customers the opportunity to access funds that will put their account into a negative balance at the ATM, through POS, or teller window without customer knowledge.** Banks should communicate clearly with their customers and disclose all fees and charges associated with transactions that will result in an overdraft status on the account. If bankers make the decision to allow customers to overdraw their account balance at the ATM, through POS, or teller window, if technically feasible the bank should inform the customer at the time of the transaction that they will incur an additional fee for overdrawing under the circumstances. If this is not technically feasible, the bank should place notices at the ATM or have a policy in place that does not allow the customer to overdraw the account at the ATM.

Banks should not mislead their customers as to the actual balance in their account and they should clearly present balances to their customers in a format that is easy to understand. For example, if the overdraft limit is included in an "available balance," the text on the ATM screen and receipt should specifically state that the balance includes the overdraft limit. Mistakes are easily made if this information is not communicated to the customer clearly at the time of the transaction. Additionally, banks should consider waiving any initial NSF fees for customers who inadvertently overdraw their checking account due to any type of confusion at electronic channels.

**4. Don't leave out effective risk management.** Given the loss history of bank overdraft programs, bank management should develop reasonable loss recognition guidelines and establish loan loss reserve methodologies to ensure timely loss recognition and estimated loss coverage. This is imperative. Strict loss-recognition programs and tracking are recommended.

## CONCLUDING REMARKS

With the wide range of opinions and heartfelt emotions concerning overdraft programs, it is no wonder that many inside and outside the industry question either the practice or the methods of overdraft services.  In sorting through the facts and opinions, history can be an excellent guide.  In the May 20, 1961, issue of *Business Week*, the headline read, "With the Fed showing no signs of easing its regulations, banks are doubting the wisdom of offering certificates of deposit."[1]  Believe it or not, this statement was made concerning negotiable CDs!

Even the most pedestrian of bank products today, certificates of deposit, were once the subject of much debate and concern.  Consumer needs often are ahead of regulatory management and public policy.  Such may be the case with formalized overdraft programs.  Bankers, however, must carefully consider all sides of the formalized overdraft option to make the best decision for their banks.

---

[1] "Some Second Thought to CDs," *Business Week*, 20 May 1961, 138.

**APPENDIX**
**Letter to Bank CEOs from the ABA Chairman-Elect.**

Date: March 21, 2003
To: Bank CEOs
From: Ken Fergeson, ABA Chairman-Elect

Hundreds of banks are offering automated bounce protection on checking accounts, a new version of bankers' traditional practice of paying overdrafts. Many other banks are considering it. That's why I'm writing. As ABA's Chairman-Elect and a community banker, I'm hearing a lot of concern about this product and the consequences of offering and promoting it.

All bankers want a fair return. But bankers also have a responsibility to treat customers fairly and provide them with clear, conspicuous disclosures. One misleading phrase or questionable ad can destroy your customers' trust in a heartbeat, an awfully high price to pay. As one compliance officer wrote about paying interest on investable balances, "It's cute. It's legal. Don't do it!" When put under a spotlight, that practice led Congress to enact the Truth-in-Savings Act and the Fed to issue Reg DD. That example could be a preview of coming attractions if bankers don't look carefully before they leap into this.

Consumers like overdraft protection. It can save them returned-check fees from creditors or merchants and avoid tarnishing their credit rating in credit bureaus and databases. But some of these products have drawn fire from the regulators and in the media—and litigation won't be far behind, as customers start complaining about unfair treatment.

Overdraft protection has been around for a long time, but has evolved over the years. Under automated bounce protection systems that are now gaining in popularity, banks disclose that they may pay overdrafts up to a limit—usually between $100 and $500, depending on the customer. The feature is typically available to all those eligible to open an account. There is no creditworthiness test as there is for an overdraft line of credit. A flat fee is charged for the overdraft, regardless of the amount.

Before you offer a bounce protection product, decide if you'd want to defend the one you're considering in your local newspaper or to your regulator. To protect yourself and your institution's reputation, you should, at a minimum:

- Disclose, disclose, disclose. Disclose costs and terms in the agreement fully and conspicuously, including treatment of debit card overdrafts. And disclose charges prominently in statements.

- Make clear that the bank is not promising to pay checks, even if the consumer meets the criteria for paying an overdraft.

- Do not encourage overdrafts in your marketing materials, advertising or communications. Some customers have bounced checks because, on balance inquiries, their bank adds the amount of their overdraft protection to their true balance, leading them to believe they have more than they do. Some bank messages encourage them to use the product anytime.

- Monitor the account for frequent use of the service. Customers may not understand how to use it appropriately.

All of these efforts may still not be enough. Done carefully, automated bounce protection programs can be good for your customers and for the banks. But without understanding how your program will be seen and judged in your community, in the agencies and in court, it could become your worst nightmare. If you offer one, proceed with caution and make sure you do it right.

If you have any questions or concerns, please contact ABA Regulatory Director Jim McLaughlin, at 1-800-BANKERS.

# BIBLIOGRAPHY

Berenson, Alex. "Some Banks Encourage Overdrafts, Reaping Profit," *New York Times*,
22 January 2003, A1.

Board of Governors of the Federal Reserve System. *Annual Report to the Congress on
Retail Fees and Services of Depository Institutions*, June 2002.

Consumer Federation of America and National Consumer Law Center, "Bounce
Protection:  How Banks Turn Rubber Into Gold by Enticing Consumers to Write Bad
Checks." 27 Jan. 2003, http://www.consumerfed.org/bounceappendix012803.pdf,
17 September 2003.

Colton, Roger D.  "Determining the Cost Effectiveness of Utility Late Payment
Charges." July 1994, http://www.fsconline.com/downloads/LATE-FEE.pdf,
17 September 2003.

Feddis, Nessa Eileen.  "Will We Kill a Useful Service?"  *ABA Banking Journal*, April
2003, 38-42.

Fergeson, Ken.  Letter to Bank CEOs from the ABA Chairman-Elect.  21 March 2003.

Office of the Comptroller of the Currency. *Interpretive Letter #914*. 15 USC 1691, 12
CFR 215, 12 CFR 226, SBJ CONS, September 2001.

Raddon Financial Group.  "Consumer Trends in Checking Accounts,"  Spring 2002.

"Some Second Thoughts on CDs." *Business Week*, 20 May 1961, 138.

# EXHIBIT "E"



# Overdraft Explosion:

## Bank fees for overdrafts increase 35% in two years

Leslie Parrish
Center for Responsible Lending

October 6, 2009



CENTER FOR
RESPONSIBLE
LENDING

www.responsiblelending.org

## TABLE OF CONTENTS

Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Conclusion & Policy Recommendations . . . . . . . . . . . . . . . . . . . 7

Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Summary Findings:**

Finding 1:   Over 50 million Americans overdrew their checking account at least once over a 12-month period, with 27 million accountholders incurring five or more overdraft or non-sufficient funds (NSF) fees.

Finding 2:   Banks and credit unions collected nearly $24 billion in overdraft fees in 2008.

Finding 3:   Overdraft fee income for banks and credit unions rose 35 percent from 2006 to 2008.

## OVERVIEW

*I*t is now standard practice for most banks and credit unions to automatically enroll checking account customers in their most expensive overdraft loan program—one in which the financial institution generally approves transactions when the accountholder does not have enough funds to cover them, in return for a fee of around $34 per overdraft.

Banks contend that this type of overdraft protection is a service to their customers, helping them to avoid bouncing checks. They further claim that the alternative would be to return the check unpaid, with the customer incurring an NSF fee from the bank and, potentially, a bad check fee from a merchant or a late fee from a landlord or utility company.

> *Overdraft fees are most typically triggered not by checks, but by debit card transactions and ATM withdrawals that could easily be denied for no fee.*

However, the reality is far different than the scenario painted by banks. Overdraft fees are most typically triggered not by checks, but by debit card transactions and ATM withdrawals that could easily be denied for no fee.[1] In addition, common banking practices—such as re-ordering transactions from largest to smallest—increase the number of overdraft fees paid by customers rather than helping them avoid charges.[2] Institutions also generally place no meaningful limits on how many fees a customer can incur within a given period.[3] Finally, because banks generally charge a fixed overdraft fee regardless of the size of the transaction covered, the fee bears no relationship to the actual cost to the institution of covering the overdraft. In fact, previous CRL research found that consumers paid about $2 in fees for every $1 in credit extended if they overdrew their account using a debit card at a checkout counter.[4]

These practices are especially alarming given that institutions automatically enroll consumers into this type of program, even when lower-cost forms of overdraft protection—such as a formal overdraft line of credit or a link to a savings account—are usually available. Several CRL surveys have found that an overwhelming majority of respondents, including those who have recently overdrawn their account, want a choice about what—if any—form of overdraft program to enroll in and prefer that debit card overdrafts not be covered.[5]

This report quantifies the number of Americans that have overdrawn their account and are potentially affected by the abusive practices typical of today's overdraft loan programs. It also updates previous CRL estimates of the resulting costs incurred by consumers. To this end, we utilize results from a recent FDIC study to estimate the number of Americans whose accounts become overdrawn in a given year, with a focus on those accountholders with five or more incidents per year. In addition, we also update our 2006 estimate of the total cost consumers pay annually in overdraft fees and evaluate the dramatic increase in fees over a two-year period.

## FINDINGS

### Finding 1: Over 50 million Americans overdrew their checking account at least once over a 12-month period, with 27 million accountholders incurring five or more overdraft or non-sufficient funds (NSF) fees.

A recent survey of 39 FDIC-regulated banks holding 6.5 million accounts found that about one of every four checking accounts became overdrawn at some point over a twelve-month period, and about one out of seven checking accounts was overdrawn five or more times.[6]

If we assume one checking account per adult (excluding those who lack a bank account entirely), an estimated 51 million Americans overdrew their account—and were therefore assessed either an overdraft or NSF fee—over the past 12 months. Perhaps more troubling, over half of those— 27 million Americans in all—incurred five or more overdraft incidents during the same time period. To put this number into perspective, more Americans overdrew their account at least five times than live in the state of Texas. A majority of accountholders in this category significantly exceeded five overdrafts; nearly two-thirds of these 27 million had ten or more incidents within a one-year period. Table 1 and Figure 1 below detail our calculations.

**Figure 1: Share of total checking accounts that become overdrawn during a year and total accountholders affected**



| | At least once | Five or more | Ten or more |
|---|---|---|---|
| Adults impacted (in millions) ■■■ | 51 | 27 | 18 |
| Share of accounts —■— | 25.7% | 13.9% | 8.9% |

Number of times overdrawn annually

Table 1: Number of adults affected by overdrawn accounts annually

| | |
|---|---|
| (A) Total population age 18 and over* | 225 million |
| (B) Population without a bank account** | 28 million |
| (C) Total adults with a bank account (C=A-B) | 197 million |
| (D) Adults impacted by at least one overdraft incident (C*25.7%) | 51 million |
| (E) Adults impacted by at least five overdraft incidents (C*13.9%) | 27 million |
| (F) Adults impacted by ten or more overdraft incidents (C*8.9%) | 18 million |

*2008 Current Population Survey, U.S. Census Bureau

**The FDIC's Alliance for Economic Inclusion estimates that as many as 28 million people in the United States are unbanked.

In previous research, CRL found that consumers who repeatedly overdraw their account are more likely to be low-income, single, non-white, and renters.[7] In its analysis of the income and age of accountholders with overdrawn accounts, the FDIC found that lower-income groups and young adults age 18-25 were the most likely to incur an overdraft or NSF fee.[8]

## Finding 2: Banks and credit unions collected nearly $24 billion in overdraft fees in 2008.

These millions of Americans who overdraw their accounts represent an increasingly significant source of fee income for financial institutions. Banks and credit unions are not required to directly report their total income related to overdraft and NSF fees; however, the FDIC found that nearly three-quarters of its banks' service charge income was the result of overdraft and NSF fees.[9] Using this breakdown, we estimate that banks and credit unions assessed their customers $34.3 billion in fees when their accounts became overdrawn in 2008. We estimate that 69 percent of this $34.3 billion, or $23.7 billion, is comprised of overdraft fees alone.[10]

Table 2: Total overdraft fees collected by banks and credit unions

| | | |
|---|---|---|
| (A) Service charge income (Banks)* | | $39.5 billion |
| (B) Fee income (Credit Unions)** | | $6.8 billion |
| (C) Total service charge/fee income, all banks and credit unions (A+B) | | $46.3 billion |
| (D) Estimated share of (B) and (C) generated by overdraft and NSF fees*** | 74% | |
| (E) Estimated total overdraft and NSF fees collected (C*D) | | $34.3 billion |
| (F) Estimated share of (E) attributable to overdraft fees alone | 69% | |
| (G) Estimated total overdraft fees alone (E*F) | | $23.7 billion |

*Service charge income as reported in FDIC call report data for 2008.

**Fee income (the equivalent of service charge income for credit unions) as reported by the National Credit Union Administration for 2008.

***Based on findings from the 2008 FDIC Study of Bank Overdraft Programs.

These fees are likely to be even higher in 2009. One leading analyst of bank and credit union fees projects that $38.5 billion in overdraft and NSF fees will be collected this year.[11] If our current assumptions hold, overdraft loan fees will comprise nearly $27 billion of this total amount.[12]

**Finding 3: Overdraft fee income for banks and credit unions rose 35 percent from 2006 to 2008.**

Our new estimate that consumers paid $23.7 billion in overdraft fees in 2008 represents a 35 percent increase since our last estimate in 2006. In absolute terms, overdraft fees increased $6.2 billion in two years—part of a continuing trend that we have observed since our first estimate in 2004, and which we expect to continue through 2009.

Figure 2: Increase in overdraft fees over time



Rising overdraft fees have several underlying sources. First, many financial institutions have increased the fee per overdraft incident and are more frequently charging additional fees if a customer's account remains overdrawn for several days.[13] In addition, some banks no longer employ caps on the total fees incurred per day, heightening the chances that someone with multiple transactions will pay hundreds of dollars in fees before even knowing their account is overdrawn.[14]

Second, consumers are using debit cards—the most common trigger of overdrafts—both more frequently than in the past and for increasingly small transaction amounts. Today, nearly three-quarters of checking account customers have a debit card, with active card users averaging 17 debit card transactions per month.[15] As a result, debit card usage has exceeded credit card usage since 2005.[16] At the same time, the average debit card transaction size has decreased by about four percent per year, with more than a quarter of all debit card transactions now conducted for purchases of less than $10.[17] As an analyst from the First Manhattan Consulting Group has noted, "the wide adoption of debit cards had

> *"[T]he wide adoption of debit cards had two multiplicative effects: it increased the possibility of a mistake that would take an account negative, and it also increased the number of overdraft events while the customer was unaware he had crossed the line."*
>
> –analyst, First Manhattan Consulting Group

two multiplicative effects: it increased the possibility of a mistake that would take an account negative, and it also increased the number of overdraft events while the customer was unaware he had crossed the line."[18]

As a result of these trends, service charge income, of which overdraft and NSF fees play an increasingly large part, has steadily increased.

Table 3: Change in overdraft fees collected, 2006–2008

|  | 2006 | 2008 |
|---|---|---|
| (A) Service charge/fee income | $42.2 billion | $46.3 billion |
| (B) Share of (A) generated by overdraft and NSF fees | 60% | 74% |
| (C) Total overdraft and NSF fees collected | $25.3 billion | $34.3 billion |
| (D) Share of (C) attributable to overdraft fees alone | 69% | 69% |
| Total attributable to overdraft fees alone | $17.5 billion | $23.7 billion |

## DISCUSSION

Overdraft fees eat into the already-strained budgets of working families, with Americans now spending far more on overdraft fees annually than they do on common household items such as books, cereal or postage stamps. Americans spend about the same amount on overdraft fees as they do on fresh vegetables every year, and only a little less than they do on fresh fruit.[19]

Figure 3: Annual fees resulting from overdrafts, as compared to common household expenditures



Overdraft fees are charged to people who typically are enrolled in an overdraft program without their consent. In most cases—particularly if they are using debit card—survey results show that consumers would rather have their transaction denied than be approved in exchange for a $34 fee.[20]

Overdraft Explosion: Bank fees for overdrafts increase 35% in two years

Table 4: Share of respondents who would prefer their transaction be denied at the checkout counter, if account overdrawn, among those with a preference[21]

|                  | Would prefer to be declined |
|------------------|-----------------------------|
| $5 transaction   | 80%                         |
| $20 transaction* | 79%                         |
| $40 transaction  | 77%                         |

*The average debit card transaction triggering an overdraft fee is $20.

Overdraft fees triggered by small dollar transactions, most typically occurring when a debit card is used, are especially pernicious because the credit extended to cover the shortfall is often far smaller than the overdraft fee charged. In previous research we found that, even when accounting for overdrafts caused by checks and other triggers, the overall overdraft fees charged exceed the credit extended.[22] For 2008, we estimate that checking account holders receive only $21.3 billion in credit for the $23.7 they pay in overdraft loan fees.[23] Put another way, consumers were obligated to repay $45 billion for $21.3 billion in extremely short-term credit.[24]

*For 2008, consumers were obligated to repay $45 billion for $21.3 billion in extremely short-term credit.*

The Federal Reserve is currently considering whether—and how—to provide better consumer choice about enrollment in bank overdraft programs.[25] As described in our policy recommendations below, however, regulators must go further to curb existing abuses. In addition, Congress is considering larger-scale reforms to overdraft loan programs.[26]

## CONCLUSION & POLICY RECOMMENDATIONS

Each year, over 50 million Americans overdraw their checking account, paying nearly $24 billion in overdraft fees. Twenty-seven million Americans pay five or more overdraft or NSF fees each year. The most common triggers of these fees are small debit card transactions that could easily be denied for no fee.

Financial institutions engage in abusive practices that maximize overdraft fee revenue. They approve debit card transactions that they could deny for no fee; they charge exorbitant fees that bear no relationship to the cost of covering an overdraft; they charge excessive numbers of overdraft fees over the course of a day, month, or year; and they automatically enroll customers in the most expensive overdraft option available.

*Financial institutions approve debit card transactions that they could deny for no fee; they charge exorbitant fees that bear no relationship to the cost of covering an overdraft; they charge excessive numbers of overdraft fees over the course of a day, month, or year; and they automatically enroll customers in the most expensive overdraft option available.*

As more transactions are conducted through debit cards and banks find new ways to increase their overdraft charges, the cost to accountholders will climb further Policymakers and regulators can help protect consumers from abusive features of overdraft loan programs by adopting the following recommendations:

**Prohibit overdraft fees on debit card purchases and ATM withdrawals.** As a limited exception, a fee could be allowed only if the customer were provided a real-time warning and an opportunity to cancel the transaction. Overdraft fees triggered by debit cards could be denied for no fee—the outcome consumers overwhelmingly prefer. As recently as 2004, 80 percent of all institutions denied debit card overdrafts, and at least one large bank and a number of smaller institutions continue to decline debit card transactions that would otherwise result in an overdraft.[27] Moreover, the typically small transaction size of debit card transactions means that accountholders often pay more in fees than they receive in credit. Overdraft fees on debit card purchases and ATM withdrawals should either be prohibited altogether, or they should only be allowed if consumers are provided a real-time warning notifying them that the transaction will result in an overdraft and telling them the amount of the overdraft fee. Once this warning is given, the consumer should be given an opportunity to cancel the transaction or use another method of payment.

> *Overdraft fees triggered by debit cards could be denied for no fee—the outcome consumers overwhelmingly prefer.*

**Require that overdraft fees be reasonable and proportional to the actual cost to the financial institution of covering the overdraft.** On average, overdraft fees exceed the amount of credit extended, which is particularly troubling given the short time period until repayment—usually only a few days.[28] Since banks are able to repay themselves out of the accountholder's next deposit, these loans carry a low default risk relative to their high cost. Overdraft fees should be proportional to the actual cost to the institution of covering the overdraft, taking into account the cost of funds, default risk, and a reasonable profit margin. Indeed, a product designed to be proportional to the cost to the institution of covering the overdraft already exists—an overdraft line of credit at a reasonable interest rate.

**Limit excessive overdraft fees.** Consumers who overdraw their accounts frequently may find that overdraft fees beget more overdraft fees, driving them further into debt and ultimately making them less able to meet essential expenses. Once a customer has paid an excessive number of overdraft fees within a 12-month period, the financial institution should be required to provide the customer a longer-term, lower-cost alternative, such as an overdraft line of credit, in order to continue charging the customer for overdrafts. Policymakers should determine what constitutes an excessive number of fees, but it should be no more than six fees per year.

> *Policymakers should determine what constitutes an excessive number of fees, but it should be no more than six fees per year.*

---

Prohibit overdraft fees unless the customer has affirmatively consented, or "opted in," to the institution's overdraft loan program. CRL surveys have found that nearly 90 percent of accountholders want to choose whether or not to be enrolled in an overdraft loan program.[29] Financial institutions should be prohibited from charging an overdraft fee unless the customer has affirmatively agreed to be enrolled.

Require banks and credit unions to comply with the Truth in Lending Act for overdraft loans by disclosing their cost in terms of an annual percentage rate. When a financial institution covers a transaction when there are insufficient funds in an account, they are extending credit to that customer. Regulators should clarify that overdraft fees are finance charges under the Truth in Lending Act and require appropriate disclosures to help consumers compare the cost of borrowing through fee-based overdraft with other alternatives, such as an overdraft line of credit.

Create a Consumer Financial Protection Agency (CFPA) to protect consumers against unfair practices in the financial services industry. While federal regulators have recognized problems with overdraft loan practices since the early 2000s, meaningful reforms have yet to be required. The creation of a new agency focused on consumer protection would provide much needed oversight of products offered throughout the financial services industry, and the CFPA could prohibit abusive banking practices such as those related to overdraft loans.

## NOTES

1 Debit card transactions (either at the point of sale or ATM) cause 44 percent of total overdrafts, while checks trigger just 27 percent. See Eric Halperin, Lisa James, & Peter Smith, *Debit Card Danger: Banks offer little warning and few choices as customers pay a high price for debit card overdrafts*, Center for Responsible Lending (January 25, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/Debit-Card-Danger-report.pdf.

2 For an example of how transaction re-ordering can generate more overdraft fees, see Eric Halperin & Peter Smith, *Out of Balance: Consumers pay $17.5 billion per year in fees for abusive overdraft loans*, Center for Responsible Lending (July 11, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/out-of-balance-report-7-10-final.pdf at page 5.

3 While some financial institutions have recently lowered the number of overdraft fees per day a customer can be charged, these fees can be well in excess of $100 daily.

4 In an analysis of a large database of checking account transactions, CRL found that the median overdraft resulting from a debit card transaction cost the consumer $1.94 per $1 borrowed. See Eric Halperin, Lisa James, & Peter Smith, *Debit Card Danger: Banks offer little warning and few choices as customers pay a high price for debit card overdrafts*, Center for Responsible Lending (January 25, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/Debit-Card-Danger-report.pdf.

5 See survey findings in Leslie Parrish, *Consumers Want Informed Choice on Overdraft Fees and Banking Options*, Center for Responsible Lending (April 16, 2008), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/final-canvan-survey-4-16-08.pdf and *Overdraft Fees and Opting In: A survey of consumer preferences*, Center for Responsible Lending (March 2009) available at http://www.responsiblelending.org/overdraft-loans/research-analysis/consumer-preference-opt-in.pdf. In the 2008 survey, 88 percent of respondents reported wanting a choice as to whether their debit card overdrafts would be covered, and more than three-quarters preferred debit card transactions resulting in an overdraft be declined.

6 FDIC Study of Bank Overdraft Programs, Federal Deposit Insurance Corporation (November 2008), available at http://www.fdic.gov/bank/analytical/overdraft/FDIC138_Report_Final_v508.pdf. Calculations based on findings in Table IX-11 at page 76.

7 Lisa James & Peter Smith, *Overdraft Loans: Survey finds growing problem for consumers*, Center for Responsible Lending (April 24, 2006), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/ip013-Overdraft_Survey-0406.pdf.

8 See pages 77-80 of FDIC Study of Bank Overdraft Programs, Federal Deposit Insurance Corporation, (November, 2008), available at http://www.fdic.gov/bank/analytical/overdraft/FDIC138_Report_Final_v508.pdf.

9 The FDIC found that, among the financial institutions it regulates that participated in its survey, overdraft and NSF fees made up 74 percent of all service charge income. While the FDIC cautions that this breakdown may not be applicable to all banks and credit unions, several industry analysts, including Bretton Woods and Moebs Services, have found similar results across financial institutions. See *FDIC Study of Bank Overdraft Programs*, Federal Deposit Insurance Corporation (November 2008), available at http://www.fdic.gov/bank/analytical/overdraft/FDIC138_Report_Final_v508.pdf.

10 In an analysis of a large database of checking account transactions, we found that overdraft fees were assessed 69 percent of the time when a consumer overdrew their account, while NSF fees were incurred only 31 percent of the time. See Eric Halperin & Peter Smith, *Out of Balance: Consumers pay $17.5 billion per year in fees for abusive overdraft loans*, Center for Responsible Lending (July 11, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/out-of-balance-report-7-10-final.pdf.

11 Mike Moebs of Moebs Services, Inc. projects $38.5 billion in overdraft and NSF fees will be collected in 2009, with roughly 70 percent, or $27 billion attributable to overdraft fees alone. See Ron Lieber & Andrew Martin, *Overspending on Debit Cards is a Boon for Banks*, The New York Times (September 8, 2009).

12 Using our current assumption that overdraft fees alone comprise 69 percent of overdraft and NSF fees, we project $26.6 billion in overdraft fees for 2009 based on Mike Moebs' projection ($35.8 billion * 69% = $26.6 billion), which approximates Moebs' own projection of $27 billion.

13 Jean Ann Fox, *Fees for Unauthorized Overdraft Loans Keep Going Up at Largest Banks: Consumers need better protections to safeguard bank accounts*, Consumer Federation of America (July 31, 2009), available at http://www.consumerfed.org/pdfs/OD_CFA_bank_fee_survey_release_2009_final.pdf.

14 Jean Ann Fox, *Fees for Unauthorized Overdraft Loans Keep Going Up at Largest Banks: Consumers need better protections to safeguard bank accounts*, Consumer Federation of America (July 31, 2009), available at http://www.consumerfed.org/pdfs/OD_CFA_bank_fee_survey_release_2009_final.pdf.

15 *Despite Recession, Card Issuers Expect Debit Growth in 2009: 2009 Debit Issuer Study*, commissioned by PULSE, reveals greater PIN debit use and lower fraud losses, Pulse Network (June 4, 2009), available at https://www.pulsenetwork.com/public/upload/storage/file250/file/2009-Debit_Issuer_Study_Release.pdf.

16 In 2005, there were 26 billion debit card transactions, compared to 22 billion credit cards transactions. Debit card usage is expected to increasingly exceed that of credit cards, with a projected 46 billion debit card transactions compared to 30 billion credit card transactions by 2012. Data from The Nilson Report, November 2008, Issue 914.

17 According to the 2007 Federal Reserve Payments Study, the average value per signature debit card transaction decreased by 4.3 percent per year in constant dollars from 2003 to 2006, and the average value per PIN debit card transaction decreased by 3.9 percent per year during the same time period. See *The 2007 Federal Reserve Payments Study: Noncash payment trends in the United States, 2003-2006*, Federal Reserve System

(December 10, 2007), available at http://www.frbservices.org/files/communications/pdf/research/2007_payments_study.pdf. The *2009 Debit Issuer Study* found that 27 percent of debit card transactions in 2008 were for less than $10. See *Despite Recession, Card Issuers Expect Debit Growth in 2009: 2009 Debit Issuer Study, commissioned by PULSE, reveals greater PIN debit use and lower fraud losses*, Pulse Network (June 4, 2009), available at https://www.pulsenetwork.com/public/upload/storage/file250/file/2009-Debit_Issuer_Study_Release.pdf.

18  *Recrafting the Checking Account Product Line: Responding to the Unhappily Unbanked*, First Manhattan Consulting Group (2009).

19  The 2007 Consumer Expenditure Survey conducted by the Bureau of Labor Statistics finds that households spend, on average, $118 on reading materials, $143 on cereal, $152 on postage and stationery, $190 on fresh vegetables, $202 on fresh fruits, and $231 on major appliances. To calculate the total consumer expenditures, we multiply these amounts by the 120,171,000 U.S. households. For more information, see http://www.bls.gov/cex/. A similar analysis was performed by consulting firm Oliver Wyman, see Aaron Fine, Andrew Dresner, & David Goldberg, *Insufficient Funds: The outlook for deposit fees and implications for banking institutions*, Oliver Wyman (2009).

20  See survey findings in Leslie Parrish, *Consumers Want Informed Choice on Overdraft Fees and Banking Options*, Center for Responsible Lending (April 16, 2008), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/final-caravan-survey-4-16-08.pdf.

21  Leslie Parrish, *Consumers Want Informed Choice on Overdraft Fees and Banking Options*, Center for Responsible Lending (April 16, 2008), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/final-caravan-survey-4-16-08.pdf.

22  CRL found that banks and credit unions collected $17.5 billion in overdraft fees in 2006, while only extending $15.8 billion in credit. See Eric Halperin & Peter Smith, *Out of Balance: Consumers pay $17.5 billion per year in fees for abusive overdraft loans*, Center for Responsible Lending, (July 11, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/out-of-balance-report-7-10-final.pdf.

23  In our 2006 study, we found that credit extended equated to 90.1 percent of total overdraft fees. Using these same assumptions for 2008, banks and credit unions collecting $23.7 billion in overdraft fees would extend only $21.3 billion in credit ($23.7 billion * 90.1% = $23.7 billion). See the appendix of Eric Halperin & Peter Smith, *Out of Balance: Consumers pay $17.5 billion per year in fees for abusive overdraft loans*, Center for Responsible Lending (July 11, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/out-of-balance-report-7-10-final.pdf for methodology.

24  Consumers who overdraw their accounts must repay the amount of credit extended in order to bring their account balance back above zero as well as the fees incurred. This equates to $45 billion dollars ($21.3 billion in credit + $23.7 billion in fees).

25  The Federal Reserve is considering changes to Regulation E which would impact overdraft loan programs, see http://edocket.access.gpo.gov/2009/pdf/E8-31184.pdf.

26  Reforms to overdraft loan programs have been introduced by Rep. Carolyn Maloney (D-NY) as HR 1456, the Consumer Overdraft Protection Fair Practices Act.

27  For example, in most circumstances, Citigroup will not approve a debit card transaction or charge an overdraft fee if the transaction if the customer lacks adequate funds.

28  Previous CRL research has found that consumers pay their overdraft fees and bring their accounts back above zero within 2-5 days, on average. See Eric Halperin, Lisa James, & Peter Smith, *Debit Card Danger: Banks offer little warning and few choices as customers pay a high price for debit card overdrafts*, Center for Responsible Lending (January 25, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/Debit-Card-Danger-report.pdf.

29  Leslie Parrish, *Consumers Want Informed Choice on Overdraft Fees and Banking Options*, Center for Responsible Lending (April 16, 2008), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/final-caravan-survey-4-16-08.pdf and *Overdraft Fees and Opting In: A survey of consumer preferences*, Center for Responsible Lending (March 2009) available at http://www.responsiblelending.org/overdraft-loans/research-analysis/consumer-preference-opt-in.pdf.

## *About the Center for Responsible Lending*

The Center for Responsible Lending is a nonprofit, nonpartisan research and policy organization dedicated to protecting homeownership and family wealth by working to eliminate abusive financial practices. CRL is affiliated with Self-Help, one of the nation's largest community development financial institutions.

Visit our website at **www.responsiblelending.org.**

**North Carolina**
302 West Main Street
Durham, NC 27701
Ph (919) 313-8500
Fax (919) 313-8595

**California**
1330 Broadway
Suite 604
Oakland, CA 94612
Ph (510) 379-5500
Fax (510) 893-9300

**District of Columbia**
910 17th Street NW
Suite 500
Washington, DC 20006
Ph (202) 349-1850
Fax (202) 289-9009

© Copyright 2009